**Pages 1 - 48**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

SOFTWARE RESEARCH, INC.,           )
                                   )
          Plaintiff,               )
                                   )
   VS.                             )      **NO. C 18-00232 EMC**
                                   )
DYNATRACE, INC., and DOES 1        )
through 10,                        )
                                   )
          Defendants.              )
                                   )

                         San Francisco, California
                         Thursday, June 21, 2018

                  **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    SINGER/BEA LLP
                    601 Montgomery Street - Suite 1950
                    San Francisco, California  94111
              BY:   **BENJAMIN L. SINGER, ATTORNEY AT LAW**
                    **EVAN N. BUDAJ, ATTORNEY AT LAW**

For Defendants:
                    DUANE MORRIS LLP
                    2475 Hanover Street
                    Palo Alto, California  94304
              BY:   **KARINEH KHACHATOURIAN, ATTORNEY AT LAW**

Reported By:        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                    Official Reporter

**Thursday - June 21, 2018**                                    **2:58 p.m.**

                          **P R O C E E D I N G S**

                              **---oOo---**

        THE CLERK:  Calling case C 18-0232, Software Research versus Dynatrace.

     Counsel, please come to the podium and say your name for the record.

        MR. BUDAJ:  Good morning, Your Honor.  Evan Budaj from Singer/Bea on behalf of plaintiff Software Research, Inc.

        THE COURT:  All right.  Thank you.

        MR. BUDAJ:  And also with me is Benjamin Singer from the same firm for the plaintiff.

        THE COURT:  All right.  Good afternoon, Mr. Singer.

        MS. KHACHATOURIAN:  Good afternoon, Your Honor.  Karineh Khachatourian here for Dynatrace.

        THE COURT:  All right.  Thank you, Ms. Khachatourian.

     This is a bit unusual the way this is postured, but maybe you can explain to me exactly from your perspective what is Dynatrace Performance Management?  I mean, you're describing what it's not, but I'm not sure what -- your explanation of what it is.

        MS. KHACHATOURIAN:  It's a marketing term, Your Honor.

        THE COURT:  It's a marketing -- what does that mean, "marketing term"?  Marketing term for what?

        MS. KHACHATOURIAN:  So, for example, "cloud" is a

marketing term.  Like, you know, "We have cloud services. We're in the cloud."

THE COURT:  Yeah.  But what I'm asking you specifically, what is it?  A marketing term for what?  What does Dynatrace provide?

MS. KHACHATOURIAN:  All kinds of software and IT services.

THE COURT:  Okay.  Is there something that's used to test -- perform the kind of testing that -- we're talking about websites -- that is -- is it a product?  Is it a service?  Is it distinct from other, for instance, application testing?

MS. KHACHATOURIAN:  Well, Your Honor I think you've honed in on what the issue is here.  So "website testing" is a very broad term and is not what -- the patents are not just website testing.  From what I can tell, they are -- they have to do with a specific website testing called Synthetic Monitoring Testing.

And I have tried to compromise with opposing counsel to say --

THE COURT:  Before we get there, I'd like you to answer my question.

MS. KHACHATOURIAN:  Okay.

THE COURT:  Because this sounds like a lot of mishmash to me.

MS. KHACHATOURIAN:  Well, Your Honor --

THE COURT:  What is -- I'm asking a simple question.

MS. KHACHATOURIAN:  Sure.

THE COURT:  Not the deficiency and guessing what the patent covers.  What is Dynatrace Performance Management other than a marketing tool?  What is it?  What is the product?

MS. KHACHATOURIAN:  That's the problem.  It isn't a product.  So that is the difficulty here.

THE COURT:  What does Dynatrace provide?

MS. KHACHATOURIAN:  Dynatrace provides a multitude of software and IT products.

THE COURT:  Okay.

MS. KHACHATOURIAN:  Nothing that is specific --

THE COURT:  So if I own a company and I'm on the web and I'm very concerned about performance of my website and I want to be able to test it under real-world conditions through a browser, blah blah blah, is there a service or product, a specific one, or is it customized to each one?  Are there a line of products?  What is it?  If I came to your client.

MS. KHACHATOURIAN:  If you came to my client, my client would probably offer you a free trial of --

THE COURT:  Of what?

MS. KHACHATOURIAN:  -- some of their offerings that could include different aspects of website testing.

THE COURT:  So do these offerings have names?

MS. KHACHATOURIAN:  The truth of the matter is, no.

They are features.  That's -- they are features.  So when you're dealing with --

THE COURT:  So this one product that has various features that can be customized and tailored to the situation?

MS. KHACHATOURIAN:  Yes, Your Honor.

THE COURT:  So there is one thing.  It's just its actual form you might use some of it; you might use this A, B, and C but not D, F, and G; or -- but there is a thing?

MS. KHACHATOURIAN:  Well, of course, Dynatrace offers products and services.  I mean, that's not disputed.  The problem here is that when I approach Dynatrace and say, "Okay. Here is the complaint.  Here are the patents.  You know, what are your features?  What are your products?" based on the information provided, it's very difficult for them to pin it down.

THE COURT:  Even with a several-hundred-page contention -- infringement contentions with --

MS. KHACHATOURIAN:  Yes, Your Honor.

THE COURT:  -- that cite -- that at least attempts to line up each limitation with some aspect that's described on the website?

MS. KHACHATOURIAN:  Yes, Your Honor.  And the reason for that is essentially you're just splattering a whole bunch of URLs and telling us to go fetch, trying to figure it out, when these are all generic sort of terms like "playback" and

"record" and, you know, things like that.

I mean, to use the term "website testing" is incredibly broad and it's difficult to pin down what exactly they're talking about.

**THE COURT:**  But your complaint is they've not identified a product *per se*, the name of a product?

**MS. KHACHATOURIAN:**  They have not not just identified a product, but they don't explain how the -- how whatever you want to call it actually infringes element by element.

So, for example, if you look at their complaint, their complaint actually says things like "other related software."

**THE COURT:**  Tell me what paragraph.

**MS. KHACHATOURIAN:**  Okay.  Paragraph 44.  If you go to paragraph 44 --

**THE COURT:**  Okay.  Let me get there.

(Pause in proceedings.)

**THE COURT:**  Okay.

**MS. KHACHATOURIAN:**  Okay.  It says, "Defendant" --

**THE COURT:**  This is Claim 17 of the '175?

**MS. KHACHATOURIAN:**  Yes, paragraph 44.  The allegations are similar throughout, and I believe the parties agree that '175 is --

**THE COURT:**  Hold on.  '175 is also at page 77 of Exhibit A of the contentions chart.  So let's make sure I've got everything here.

(Pause in proceedings.)

**THE COURT:**  All right.  Okay.  So what's your example of something that's inadequate here?

**MS. KHACHATOURIAN:**  So paragraph 44 --

**THE COURT:**  Yeah.

**MS. KHACHATOURIAN:**  -- (reading)

"Defendants' web application monitoring and scripting tool software products" --

**THE COURT:**  What line are you on now?

**MS. KHACHATOURIAN:**  I'm sorry.  13.

(Pause in proceedings.)

**THE COURT:**  Okay.  (reading)

"... literally conducted by using certain website software, testing software, including, without limitation" -- now you're quoting the words -- "defendants' web application monitoring and scripting tool software products titled..."

**MS. KHACHATOURIAN:**  (reading)

"... and any or other related software products and services offered by Dynatrace that practices the method disclosed in the '175 patent for testing a website residing on a network," et cetera, et cetera. And then there's just this list of URLs.

**THE COURT:**  Well, and I assume that sort of tracks the infringement contentions here.

So if we look at 17 and the first -- I'm looking at page 77 of Exhibit A, the first limitations of Claim 17 is (reading):

"A method for testing a website residing on a network using a test-enabled browser said method comprising..."

So before we get there, there are corresponding description of the accused instrumentality, describes the software which uses a browser.  So the key thing is that it resides on a test-enabled browser.  Is that your contention, Counsel, that that's what this shows?  That's what the gist of the second column is?

**MR. BUDAJ:**  That's correct, Your Honor.

**THE COURT:**  Then the key would be the next thing is the comprising (reading):

"Accessing a website to be tested using the test-enabled browser."

And so your example here is (reading):

"The DPM web recorder allows the user to browse the web using common web-browsing activities.  For example, DPM allows the full integration of test scripts to test websites for recording and using its interactions of the web page in question and allowing the user to play back those test scripts.  To achieve such functionality DPM necessarily must access a website to be tested using a test-enabled browser."

And this is your description; right?  Those are your words?

**MR. BUDAJ:**  Those are the software user's words, that's right.

**THE COURT:**  And then the next thing is from the website where it says "recorder" and describes what it does?

**MR. BUDAJ:**  That's correct.  That's a screen shot from the citation listed below.

**THE COURT:**  All right.  So far -- what I've done so far, is there inadequacy of allegation?

**MS. KHACHATOURIAN:**  Your Honor, I apologize, but I don't have the infringement contentions in front of me; and I would submit to Your Honor that this is about their pleading, not about their infringement contentions.  In fact, their infringement contentions are irrelevant as to whether they have made a plausible showing.

**THE COURT:**  Well, much of what is in their infringement contentions I think is in what you've pled; is that correct, Counsel?  It looks very similar.

**MR. BUDAJ:**  That's correct, Your Honor.  There's certainly more information in the infringement contentions.  Certainly you can tell that by length; but in, for example, paragraph 44 that counsel was just pointing to, we do have a shorter description of those similar sorts of narratives of how the accused instrumentalities practice each limitation of this

claim, and then in parentheses we have specific descriptions and citations to exactly where Dynatrace's website has them.

THE COURT:  Let's take one example.  One of the elements of claim limitation is selecting a validation test to be performed; right?  That's one of the claim limitations; is that correct?

MR. BUDAJ:  Yes, Your Honor.

THE COURT:  I'm looking at line 21.

MR. BUDAJ:  Yes.

THE COURT:  And then (reading):

"... such as validate the wait validation function
    detail available on Dynatrace's website."

MR. BUDAJ:  Yes.

THE COURT:  And that is an example of selecting a validation test to be performed; is that right?

MR. BUDAJ:  That's right, Your Honor.

THE COURT:  So what is wrong with that?

MS. KHACHATOURIAN:  Your Honor, those describe generic functionalities, and what plaintiff is requiring us to do is basically identify every product in our company and then they can figure out whether it is an infringing product or not, and that is not the standard.  You need to do some diligence.  You could have done a free trial.  You could have bought the software.  You could have gotten other things other than the website.  These are generic marketing descriptions that doesn't

provide us any guidance.  That's the problem.

THE COURT:  Well, I thought you just told me that you don't have -- your client doesn't have sort of discrete separate products.  There's a general product that can be tailored to each situation.

So if that's it, I don't know -- you know, if you're -- for instance, if you're performing a service and you're tailoring to the client's need whatever testings they have, there may not be a name to that.  There's no separate product.  It's a suite of services or things within which, you know, to perform certain functions you've got to do A, B, and C and Z.

And I don't see why a plaintiff can't say, "Well, when you do A, B, C, and Z, that infringes," without calling it a name even though you may have other products that do D, F, and G.  If that's not implicated, I don't know how you can proceed.  There's not always, like, you know, the Vacuum Cleaner Model A or, you know, sometimes it's almost like a service.  I don't know.  It's a fine line between a service and a software.

MS. KHACHATOURIAN:  Your Honor, so Dynatrace provides software, as I said --

THE COURT:  Yeah.

MS. KHACHATOURIAN:  -- software for various IT and other applications, and there are free trials available on the website.  There is a lot of publicly available information about Dynatrace.

The fact of the matter is that what's going on here is the bare minimum was pled.  I'm not aware of any case that says you can identify functionalities and then the defendant is supposed to figure out what those products are.  There has to be a starting point, and that's our issue.  There is no starting point here that is consistent with the law.

THE COURT:  All right.  What's your response?

MR. BUDAJ:  Sure, Your Honor.  Our response is that the starting place is Dynatrace Digital Performance Management. That is the name of the, you know, product or suite of products or suite of functionalities that's part of a single product.

THE COURT:  Dynatrace Digital Performance?  You added the words "Digital Performance" in your complaint.

MR. BUDAJ:  Both versions are used in different places on the website, Your Honor.  Sometimes it's Dynatrace Performance Management and sometimes it's Dynatrace Digital Performance Management.

THE COURT:  Is there a difference?

MR. BUDAJ:  Our understanding is those refer to the same thing but, of course, we don't know that because we haven't received any discovery on that.

The issue here is that is the starting place.  There's what Dynatrace holds out to the public as their offering is Digital Performance Management or Dynatrace Performance Management, and they have a lot of pages about specific

functionalities that can be achieved through that software or product or group of products, whatever it is; and Software Research did its best to figure out exactly which -- you know, what -- where infringement could lie.  We pointed that out specifically.

The biggest issue that plaintiff sees here, Your Honor, is that there's apparently a disconnect between what Dynatrace tells the public about what its product and offerings are and what it knows privately but doesn't divulge.  There's potentially some individual private product names or they have some delineations that they use internally that just aren't available to the public.

We believe that we've done an adequate -- a more than adequate job of identifying, based on what information Dynatrace gives to the public, exactly what it is we're accusing.

**THE COURT:**  Is it a fair characterization to say you've treated this as if Dynatrace Performance Management or Digital Performance Management is a product that has several capabilities, several functionalities -- it can test apps; it can test websites -- but you are challenging a particular functionality as being infringing?

**MR. BUDAJ:**  Our understanding -- that's basically right, Your Honor.  Our understanding is that, from our view, from what appears available to the public, that Dynatrace

Performance Management is a product that contains numerous different functionalities.  We've pointed to at least one place that we believe those functionalities infringe.  We don't necessarily believe that everything that Dynatrace Performance Management does infringes, but we also don't know because it's not necessarily clear exactly what's encompassed within that.

THE COURT:  And your complaint at paragraph 15 and 16 references particularly the functionality of synthetic monitoring.

MR. BUDAJ:  That's true, Your Honor, and it's also true that most of the URLs and citations that we point to are to specific technical descriptions of Dynatrace Performance Management synthetic monitoring.

Again, I don't know whether to call this a platform or a functionality or a product, and so --

THE COURT:  Does your complaint reach beyond what's been deemed or called "synthetic monitoring" by Dynatrace?

MR. BUDAJ:  Yes, Your Honor.  We believe that it does, and the reason for that is it appears to us that Dynatrace Performance Management is a single product, that we've pointed to one way in which that product infringes, and that that's sufficient from a pleading standpoint.

To the extent there's additional information, for example, to the extent there's discovery about how this product works in ways that aren't described online, in ways, for example, that

maybe we won't even know until we see the source code, that's just something we can't know right now but we have identified what we believe is the accused product.  We've shown a way in which we believe it infringes, and we believe that's sufficient under *Iqbal* and *Twombly* and the relevant pleading standard.

THE COURT:  Well, but is it fair to say that as framed by your complaint now, you are focusing and your complaint is about that functionality of Dynatrace Performance Management that is referred to as synthetic monitoring reserving the possibility of amending the complaint to allege other functionalities depending on discovery?  Is that a fair --

MR. BUDAJ:  I think it's very close to that, Your Honor.  I think we would argue that the complaint covers all of Dynatrace Performance Management; but Your Honor is right that in terms of the citations we've given and the specific examples of infringement, we are pointing to the synthetic monitoring functionality.

THE COURT:  Well, in the complaint, I mean, paragraph 15 suggests that's what you're focusing on.  It says (reading):

"DPM includes functionality" -- defendants refer to it as "synthetic monitoring" -- "synthetic monitoring and functionality utilizes web-based recorder and functions of playback," blah blah blah.

And that seems to be the predicate for everything else so far.

**MR. BUDAJ:**  Yeah.  I mean, that's true, Your Honor.  That's the functionality that we're pointing to as exemplary of infringement.  We understand infringement allegations to be made on a product-by-product basis and we're saying Dynatrace Performance Management is the product that we believe infringes.  And we're also saying that synthetic monitoring is the functionality that we're pointing to in this complaint to show that that product infringes, but the allegation is against the product, not the functionality.

**THE COURT:**  Well, but some of the functionalities may infringe and some may not.

**MR. BUDAJ:**  That's correct.

**THE COURT:**  So, I mean, a fair notice to the defendant, it seems like you should at least identify which functionalities are at issue in this case.

**MR. BUDAJ:**  Yes.  And, Your Honor, as I've said, we've tried to do that to the best of our ability and there's some information that's just not available to us.  For example, we don't have the source code and we don't know how this product works.  There is just not enough technical information that exists in the world aside from the source code for us to know exactly how each functionality of this product works.

**THE COURT:**  Well, that may inform the proof that you may need with respect to infringement and it may inform the scope of your complaint; but as it stands right now, you've got

to start somewhere.

And in fairness to Dynatrace, it seems like rather than saying "Dynatrace Performance Management" generally, which everybody I think concedes has functionalities that sort of exceed, it looks like it's not just web monitoring, testing; that it's app testing, some other things that go on there that don't seem to be at issue here after looking at the patents, at least not obvious to me.

So I don't know if you're challenging every aspect but to the extent you are saying you are challenging a particular functionality and you have sort of backed that up with specific allegations and, you know, as perhaps enlightened by the infringement contentions, frankly, I don't see, in view of the description that's been given to me that there aren't, like, specific products *per se* but there's a range of services or functions that the Dynatrace Performance Management can perform, you have identified a particular functionality.

**MR. BUDAJ:** Yeah, that's true, Your Honor. And the issue is, you know, synthetic website monitoring from our understanding also is not a product. It's a particular functionality of this product. We don't -- we still don't know how this is sold. I don't know that -- I don't know if I can go to Dynatrace and ask for --

**THE COURT:** It matters less whether you call it a product, services combined with a product, or some aspect of a

product or some function.  It appears to me that so long as you identify what it is, what it does, and where it is found, that's the purpose of requiring a notice pleading that meets the requirements of *Iqbal* and *Twombly*.

MR. BUDAJ:  Sure, Your Honor.  As I said, and I don't mean to repeat myself, but I think the biggest issue here is there is some information that we just don't know and it starts all the way at the top level of what is Dynatrace Performance Management.

And, you know, yes, we've pointed to synthetic website testing because that happens to be one place where Dynatrace's website actually has a good bit of information and we were able to point to specific things, but there are a lot of functionalities of Dynatrace Performance Management that are just not clear, that it doesn't -- the website -- the public information that's available to us isn't clear what that functionality is.  We believe that we're entitled to discovery on that to determine if there's other functionality.

THE COURT:  Right.  We've got to start somewhere.  The fact that you can't identify every single functionality that might come into this case later doesn't mean you can't start somewhere.  And so my question to you is, at least in the case management statement:  Dynatrace has said they have deduced that this case is about synthetic website testing and asks if the plaintiff would limit, at least for purposes of this

complaint, the claims to synthetic website testing.  So what's the objection to that?  What's the difference between that and synthetic monitoring?

**MR. BUDAJ:**  The objection there, Your Honor, is there are other functionalities that we've looked at and that we believe might infringe but that we just don't have enough information about, and that we've tried to seek discovery on that by serving discovery requests after our 26(f) conference once discovery opened.

And not to mix and match the issues too much, but there's a discovery letter before Your Honor.  Dynatrace responded to those discovery requests by simply not responding to any of them aside from making objections.

**THE COURT:**  All right.  Before we get to that --

**MR. BUDAJ:**  Sure.

**THE COURT:**  -- is there a difference between your description in paragraph 19 of the functionality of synthetic monitoring and their reference in the case management statement about limiting this case, at least as it's presently framed, to synthetic website testing?  Is it two different things or are they basically the same thing?

**MR. BUDAJ:**  I can't say for certain what the defendant intended, but I believe those to be the same thing.

**THE COURT:**  So, I mean, clearly that's at issue here. You have clearly raised that and pled that here in my view.

The question is:  You don't want to necessarily be bound by that because you think there may be some other functionalities that may infringe and you want discovery to see if it does.

          **MR. BUDAJ:**  That's right.  We don't want discovery --

          **THE COURT:**  And the normal way you can do that is when you start off with that you know X, Y, and Z infringes, sometimes in the course of discovery you find out there's another line of products and then you move to amend, and then I have to determine whether or not I would grant the amendment under Rule 15 and look at the other usual factors:  Diligence, prejudice, et cetera, et cetera, et cetera, et cetera.

     Why can't we proceed in that normal way rather than saying, "Well, our complaint encompasses everything even though we don't know whether any of these other functionalities really infringe or not"?  At least this gives a level of specificity to start with.

          **MR. BUDAJ:**  Yeah, that's a fair question, Your Honor, and I think the biggest issue there is that we're in a situation where this is not a product that we can just look at.  This is not something where we have very detailed description of every functionality that it has.

     And the biggest --

          **THE COURT:**  You're going to get more information through discovery.

          **MR. BUDAJ:**  That's right.  And so the biggest issue

is, if the defendant is asking the Court to limit discovery just to synthetic monitoring, now we've got -- you know, we're chasing our own tail.  We can't get discovery past synthetic monitoring, which means we can't figure out what other functionalities might infringe because the defendant has convinced --

**THE COURT:**  All right.  So your concern is the scope of discovery might be delimited by how we define this lawsuit?

**MR. BUDAJ:**  That's correct, Your Honor.

**THE COURT:**  All right.  And your concern is that, you know, there hasn't been -- number one, not enough notice because they haven't described exactly what it is they're challenging; and, two, the sort of backwards discovery, you do broad discovery and then figure out where the infringement is.

**MS. KHACHATOURIAN:**  That's right, Your Honor.  I mean, I am concerned about this conversation because what I'm hearing is "We don't have -- we didn't have enough information to provide more in the complaint so we're going to sue you and then we're going to propound 48 requests for production and 8 contention interrogatories and ask for your source code; and we're basically going to ask for everything in the entire company, and then we're going to decide what is an accused product or not."  And that cannot be the standard.  That is not defendants' problem.

The plaintiff has to have a good faith basis to bring a

complaint, and they are required to --

**THE COURT:**  Well, they've got a good faith basis, as far as I'm concerned, with respect to the specified functionality that's in the complaint, which is not, apparent to me, not that different than what you are proposing, which is synthetic website testing.  Theirs is focusing on website testing, the synthetic monitoring, quote/unquote, "functionality."

So, to me, that's been adequately pled.  It's been adequately advanced in terms of infringement contentions.  I think the real issue, frankly, besides the question about the adequacy of the pleadings with respect to indirect infringement, which we can talk about in a minute, is going to be where do we go from here?  What kind of discovery should be allowed?  Should it be able to be somewhat exploratory to allow the potential expansion of this complaint or should it be strictly compartmentalized?

And I don't even know whether it could be compartmentalized because often discovery will actually spill over and there's going to be some information, but that's something that's going to have to be worked out.

**MS. KHACHATOURIAN:**  But, Your Honor, what I would submit to you is you have to be more specific in your complaint, and what they've done is their complaint even contradicts what they're asking for.

You aptly pointed out the paragraph that talked about synthetic monitoring, which I would submit is probably a little bit broader than synthetic website monitoring, but I don't know what they mean.

Then you go to the URLs, and then I basically have to try to figure it out, and they've essentially copied and pasted almost identical the URLs for each and every patent.

So just from a practical standpoint, okay, you go to a client, a company, let's say it's Apple, you say, "Okay, Apple, give me all of your documents about phones."  You can only imagine the type of reaction that you would get from Apple, or any other company for that matter.

I mean, there is a practical problem here where you have to be more specific about what you're accusing in order for us to even do the due diligence.

**THE COURT:**  I don't know what needs to be more specific particularly when I look at the infringement contentions.  It looks pretty specific.  When they're talking about the element of accessing a website to be tested using a test-enabled browser, it then describes DPM and then quotes from various parts of the website that describes what it does.  And, you know, I don't know, what else -- I'm not sure what more you would want at this stage.

**MS. KHACHATOURIAN:**  Your Honor, I want a product.  I want to know how the product actually reads on the claims.

They've basically just taken screen shots of marketing materials and said, "You infringe our product."

THE COURT: It describes what this product does.

MS. KHACHATOURIAN: Where are the user manuals that they cite in their complaint that they say they have? Where are all of these other documentation, instructions, and all this other stuff that they actually mention but don't elaborate on?

THE COURT: As I said, this is a pleading. We're not at trial yet. This is not summary judgment.

MS. KHACHATOURIAN: I understand, Your Honor.

THE COURT: We're at pleading.

MS. KHACHATOURIAN: Your Honor, I understand that. I absolutely understand that.

THE COURT: All right. I've heard enough of that. I don't want to hear anymore about that.

It's adequate for the purposes, and I'm going to delimit your complaint to what you just said, which is paragraph 15 and 16. If you want to get beyond synthetic monitoring -- and there may be some dispute, I don't know, you'll have to raise that -- the question is going to be a case management question at this point, what kind of discovery.

And I will say, before we get to the other indirect infringement allegations, that it does seem to me that many of your requests are very broad. You are asking contention

interrogatories upfront even in advance of the submission of the invalidity contentions, et cetera, and that's not appropriate.

I think the rub is going to be -- and certainly you're entitled to the kind of discovery that informs the allegations as I understand it and that I think as is pled now.  The question is -- and I don't know what it's going to look like and what the burdens would be, et cetera, et cetera -- if you ask questions that might shed light on other functionalities that might fall within the claims limitations of the patents that are asserted here, but without seeing what it is you're asking for, what the burden is on the other side, it's very hard to test the reasonableness of that.

But I'm going to treat that like any other case.  It is not unusual to make a claim of some kind of violation, and in the process you discover there's some other defendants involved, there's other policies involved.  It wasn't just a policy, you know, X.  It also calls for Y.  And so, you know, that just has to await development.

But I will say that your discovery -- many of your discovery requests exceed the scope of what's appropriate at this stage.  And I am going to refer -- with that guidance, I'm going to refer discovery matters to be more finely tuned to a magistrate judge who will handle discovery disputes with the guidance that I've just given; that this case -- this complaint

is delimited at this point with a focus on paragraphs 15 and 16 and all the justifications related thereto, but that's not to preclude necessarily potential expansion or at least request to amend the pleadings depending on what is discovered.

So I want to get to the indirect infringement claims, and there I see some real problems because just to first base is establishing pre-case knowledge of the patents in violation of the patents in question here.

And it seems to me that what is being relied upon are correspondence and notices of predecessors, but these are notices regarding a patent application on a patent that is different from the patents at issue here and this notice -- or this correspondence were with predecessors in interest, but I don't even know what the relationship -- I don't know what that means.  What does a predecessor mean in this case?  I mean, was there a purchase of just assets?  Was there a merger?  Was there -- I mean, you know, I don't know what the basis is of imputing knowledge here.

So there are sort of three problems -- three stages.  And I know you rely on the constellation of facts, but these are pretty weak constellations or facts to make up that constellation.

**MR. BUDAJ:**  Yeah, I understand the Court's view, Your Honor.  I would start where the Court ended and discuss a little bit this constellation of facts.

And, you know, I'd point again to the *SoftView* case that we've pointed to in our briefing. Specifically, you know, that court found that these three different bases were individually inadequate allegations, just as from what I just heard from the Court. I understand the Court would find each of these individual things in this case or could potentially find each --

THE COURT: But each of those inadequate alone ones had some probative value, and right now each of your two or three elements are, I think, considerably weaker than was the case in *SoftView*.

MR. BUDAJ: Sure. Your Honor, I guess we would respectfully disagree. You know, there were -- I don't know. We can take them one at a time.

First of all, there were the letters to the predecessors in interest. This wasn't, you know, just a sort of fly by. Our understanding -- and we've, you know, discussed this in the FAC, and it's at -- let's see, it's at paragraphs 17 to 25.

These are three different letters at different times sent to three different predecessors in interest to the defendant. You know, the defendant challenges whether or not these folks in fact were predecessors in interest, but we have pled that explicitly. For the purpose of a motion to dismiss, those allegations are taken as true. Those are paragraphs 18 and --

THE COURT: But what does it mean to be a predecessor

in interest?  What was the transaction and were they one away, two chains away?  What?  There's not an automatic imputation rule.  I mean, whether you're talking about labor law contracts or tort liability or statutory liability, I'm not aware of any rule that says, well, regardless of how one became a successor, that knowledge of a particular patent is automatically imputed.

MR. BUDAJ:  I don't have a case for Your Honor standing here today.  I'd be happy to look for one if Your Honor would like me to, but --

THE COURT:  What was the relationship between Keynote Systems and Dynatrace?  Did Dynatrace -- were they a direct predecessor in interest?

MR. BUDAJ:  I don't know that we -- that I know the answer to that standing here today, Your Honor.

THE COURT:  I mean, in order to infer knowledge, I mean, it's almost easier when you have a parent-subsidiary.  At least you know the relationship and one has control over the other.  Often there is common management.  There's common, you know, sometimes control, et cetera, et cetera.  A successor in interest and predecessor, it's more tenuous potentially.

MR. BUDAJ:  Potentially that's true, Your Honor, but the difference, you know, here we have three of them.  We also have, you know, SRI.  Again now we're at paragraph 26.  SRI entered into a mutual nondisclosure agreement with Keynote around this same time.

Then we've got these, you know, six, seven different applications, patents, that all cite to Mr. Miller's patents that are in the same family, and some of them in fact are patents-in-suit.  Paragraphs 33, 34, 35 at least.

We believe that -- again, Your Honor, this constellation of facts.  If this was one letter to one predecessor in interest, you know, that would be one thing; and so --

**THE COURT:**  So you're saying the '337, which was a sign to Compuware, which was one of the predecessors -- well, it wasn't even a predecessor in interest.  Adie Gamon of Nif/T, I'm not even sure what the relationship is.

I understand that --

**MR. BUDAJ:**  We understand he was representing SRI at the time in those negotiations.

**THE COURT:**  As sent from the SRI person to Peter Karmanos, then Chair and COO of Compuware, and Compuware is a predecessor in interest.

So you have a situation where information about a family of patents, a '337, not the '175 but a '337, which in turn includes a citation to the '175, that a letter was sent to somebody who was then the Chairman and COO of Compuware, which was a predecessor in interest to Dynatrace.  But I don't know -- when you say a "predecessor," I don't know if that was one removed, direct, two removed, three removed.

You could have a predecessor in interest that's a chain of

two or three long, and I don't know whether it was an acquisition of all assets.  I don't know if that was a merger or a buyout.  Was Mr. Karmanos then retained by Dynatrace?

I just -- those are the kinds of things one would want to know in order to determine what was the state of mind and knowledge of Dynatrace.

**MR. BUDAJ:**  Sure.  I understand that, Your Honor, and the truth is that we don't know, for example, what happened to Mr. Karmanos.

You know, one point that I think is relevant here, you know, Dynatrace certainly has knowledge of the patents as of the filing of the complaint.  If all we're talking about is presuit knowledge, then, you know, indirect infringement has been adequately pled.

Similar to what we discussed in terms of direct infringement, you know, this could be a case where we'll go ahead on our allegations of indirect infringement from the time of the complaint and we'll see what discovery turns up; and if it turns out that, you know, if we find earlier knowledge, then we'll come back and plead that.

**THE COURT:**  All right.  So with respect to from the filing of the complaint, then the question -- one of the questions at least with contributory infringement is whether you've adequately alleged there's no substantial noninfringing use which was known by the defendants, and I'm not sure that

that's been pled other than sort of in fairly conclusory terms.

**MR. BUDAJ:**  You know, it's hard to prove a negative. It's even harder to plead a negative.  So, you know, Your Honor, we have pled that.  And, you know, we cite in our brief *Bill of Lading* that says (reading):

"A plaintiff need not prove that the accused products have no substantial noninfringing uses at the pleading stage.  It must allege some facts that take its statements from mere lawyerly fiat to a plausible conclusion; for example, by alleging one or more infringing uses of the accused products..."

And Your Honor, it seems to me, has agreed we've done that part at least.  And then the second half is (reading):

"... and alleging that the products have no other uses."

And we've done that as well.  We've pled -- let me find the paragraph here.

**THE COURT:**  All right.  Let me get Dynatrace's response to that.  How do you plead more than that?

**MS. KHACHATOURIAN:**  So the paragraph is paragraph 46 that doesn't even mention anything about noninfringing alternatives.  And if you look at the *CAP* case, the *CAP* case specifically rejects the general type of pleading here.

So, for example (reading):

"SAP's problem is that it fails to allege any

statements by McAfee or Symantec at all.  *CAP* makes passing references to user manual guides and support articles without ever saying what those materials contain, which is wholly inadequate for an in-forensic specific intent."

Then the case goes on.  For contributory it says (reading):

"The contributory infringement claim is dismissed for a different reason, the absence of facts making that claim plausible.  To state a claim for contributory infringement, a plaintiff must, among other things, plead facts that allow an inference that the components sold or offered for sale have no substantial noninfringing uses. Here the only statement *CAP* offers on the required element about substantial noninfringing uses is nothing but a bare conclusion alleging that accused products have no other use than infringing one or more claims of the patents-in-suit."

That "bare" language is not even in paragraph 46.  So here the Court is requiring much more than what paragraph 46 states; and if they're unable to do it at this time, then they should dismiss it because it's a requirement.  It's the law.

**THE COURT:**  And your response?

**MR. BUDAJ:**  Sure, Your Honor.

Two things.  First of all, my colleague mentioned the *CAP*

case and talked about, you know, the requirement that we talk about what the materials contain.  This is exactly what we were looking at earlier, Your Honor, these, you know, quote/unquote, user manuals and instructions, and that's what Your Honor was looking at that's 150 pages in our infringement contentions and it's also cited within our complaint and we have cites to URLs. Those are some of the materials that Dynatrace uses to instruct its users how to infringe the patents.

And, you know, to the extent when we're talking specifically about the language of 46, you know, we do have this language in there and it's in our brief.  We say that (reading):

"... DPM's synthetic monitoring, when used in its normal and intended usage pursuant to the instructions set forth" --

**THE COURT:**  Where are you reading from?

**MR. BUDAJ:**  Sorry.  This is the First Amended Complaint at paragraph 46 -- and let me find the line number for you -- at line 6, the first full sentence starting at line 6 (reading):

"For example, as set forth above, DPM's synthetic monitoring, when used in its normal and intended usage pursuant to the instructions set forth on Dynatrace's website, infringes Claim 17 of the '175 patent."

This is the --

THE COURT:  Now, it doesn't allege the obverse, which is that it has no other noninfringing use.

MR. BUDAJ:  You know, so, look, this is -- we're at the pleading stage of a software case where the way the software works is delineated in the source code.  I could not with a straight face stand here and tell Your Honor that there's no possibility that the software has some other use because I haven't seen the source code.  That's the only way I can know that.

But from what I know right now, which is, you know, a two-page sort of how-to on a website that, you know, probably in the code is tens of thousands of lines of source code, based on that, the use of these features is to infringe.  There is no other use.

But could I -- would I -- am I willing to put in a complaint it's not possible that this software has, you know, any other use?  I can't say that without looking at the source code.

THE COURT:  Well, and that's where we get back to where we started, and that is:  How much do you need to plead first?  Can you just plead something that's kind of a placeholder at this point?  And I'm not so sure about that because there is a level of specificity.  And maybe the case law is not crystal clear exactly how specific one has to allege, but I think that is a question.

**MR. BUDAJ:**  Yeah.

**THE COURT:**  Let me ask you something else too with respect to the injunction part because we need to move on.

You've alleged in your briefs, I think the term is, that "SRI has commercially employed."  It doesn't say "is" currently.  It says -- and I don't know if there's anything in the complaint that says that.  I mean, would you agree that unless you are currently commercially exploiting the patent, that there is no basis for an injunction?

**MR. BUDAJ:**  I didn't see that case law or any citations anywhere in Dynatrace's brief, Your Honor, but we'll certainly believe the Court if that's what the Court understands the law to be.

I think the biggest issue here is, in fact, SRI's products are available for purchase.  SRI still operates its website. SRI still has products and software that are available.

**THE COURT:**  It is still doing business?  It is still selling -- what's the name of the product? -- e --

**MR. BUDAJ:**  eValid.

**THE COURT:**  It's still marketed?

**MR. BUDAJ:**  Your Honor, I can't tell you when the last sale was obviously.  This is a case where rampant infringement throughout the industry has essentially shut down SRI's operations and no one's purchasing from us anymore or hasn't in some time, but the website is still operational and products

are still being offered.  And there's also still current customers who are still being offered support and being offered renewals and maintenance packages and those sorts of things.

THE COURT:  That's not alleged in the complaint, though, is it?

MR. BUDAJ:  That's not alleged in the complaint, Your Honor.

THE COURT:  What's the case law?  You know, your first assertion is in a footnote in your opening brief, and then in your closing brief it's a short paragraph with no cites to any cases.  What's the case?

MS. KHACHATOURIAN:  I don't recall the cite, but it's *eBay*.  It's a pretty seminal case.

THE COURT:  The Supreme Court's decision in *eBay* is what you're saying?

MS. KHACHATOURIAN:  Correct.

Your Honor, may I just close the loop on inducement quickly?

THE COURT:  Yes.

MS. KHACHATOURIAN:  I'd just like to make two points for inducement and willfulness.

First, there aren't sufficient facts to show intent and the complaint itself contradicts because it first says that, let's look at paragraph 43, that Dynatrace or its predecessors in interest knew about the '175 patent as early as January 6,

2009.

And then later on, I believe it's paragraph 49, the complaint says (reading):

"Defendants have been aware of the '175 patent since at least as early as the filing of the SRI's complaint."

So it's, like, which one is it?  It's inherently inconsistent.

THE COURT:  Well, not necessarily.  It says "at least as early."  It doesn't say "no earlier than."  So I understand the emphasis is different.

MS. KHACHATOURIAN:  But the point being that, in the case law we cited, you have to have more than just post-complaint knowledge.  You have to show, for example willfulness, that, you know, you're acting like a pirate; that the conduct is egregious.  You can look at the *Finjan/Cisco* case where in that case the facts were that Cisco was actually an investor of Finjan, had done due diligence several times, they had discussions, and even that wasn't sufficient.

And so regardless of whether there's post-complaint notice or not, there aren't specific facts that support intent and there are not facts plausible to show egregious piratical conduct.

THE COURT:  All right.  I'm going to take the matter formally under submission and issue a ruling, but it will be along the lines as I've stated so far, at least with respect to

the claim of direct infringement.  As I construe the complaint, it adequately alleges claims of direct infringement, at least with respect to the product as it affects synthetic testing.

I am very skeptical about the indirect infringement claims and am likely to dismiss those claims.

**MR. BUDAJ:**  Is that just presuit, Your Honor, or at any time?

**THE COURT:**  Pardon?

**MR. BUDAJ:**  Is that just presuit, Your Honor, or are you referring to --

**THE COURT:**  I'll look at the postsuit, but I have some doubts about that.

**MR. BUDAJ:**  Understood, Your Honor.

**THE COURT:**  I'm going to look at the case law again.

I think the bigger issue now -- and then with respect to the injunctive relief, I don't think enough has been alleged at this point to establish an entitlement or a standing for injunctive relief, at least as alleged in the complaint.

But I do want to proceed in this case.  And I am going to refer all discovery disputes, which I anticipate may well arise based on the tenor of these discussions, to an assigned magistrate judge who will be assigned shortly to this matter to work with you as this develops.

I think what I need to do is figure out where we go from here and get us on a timetable to the next stage in this case;

but before we do that, I wanted to find out what happened to the ADR.  There was supposed to be a mediation completion date.

MR. BUDAJ:  Yes, Your Honor.  So ADR was scheduled to be completed by the 28th, which is a week from today.

THE COURT:  Yes.

MR. BUDAJ:  The answer to what has happened with that is we have gotten exactly zero discovery.  We have none of the information that we need in order to adequately value this case.  The totality of the discovery we've received is a single spreadsheet that, if I recall correctly, is two --

MS. KHACHATOURIAN:  Your Honor, I'm going to interrupt him.

THE COURT:  Hold on.

MS. KHACHATOURIAN:  No, because he's violating the NDA that we entered into with respect to mediation discussions, and I have to jump in.  He is not supposed to talk about what we provided during mediation discussions, and we have an NDA that is solid on this point.

MR. BUDAJ:  Okay.

THE COURT:  All right.  Whatever it is.

MR. BUDAJ:  We have a different understanding of that, but I can avoid talking about that.

So then I'll say --

THE COURT:  In other words, it has not occurred because there has not been the exchange of information.

**MR. BUDAJ:**  There hasn't been a single piece of discovery that I'm allowed to talk about today under Dynatrace's view.

**THE COURT:**  Well, that's one reason why, number one, I'm going to refer this immediately to a magistrate judge with a direction that the first thing I want out of anything else is for enough information to be exchanged that you can intelligently go into mediation, which is a priority in this case.

**MS. KHACHATOURIAN:**  Your Honor, that goes both ways.

**THE COURT:**  It was intended that this mediation precede claim construction and the costs of that, and I'd like for you to do that.  And so I'm going to make it clear that one of the tasks of the discovery judge in this case will be to help supervise premediation discovery and exchange of information.  And there's enough experience there because they mediate these cases themselves a lot, especially these kinds of cases, to know what it is that the parties will need to facilitate that.

So that is going to be a priority.  And so we need to reset a schedule.  I still want to have a schedule to complete mediation.

So assuming that your disputes premediation regarding discovery can get to a magistrate judge within the next several weeks and that information is exchanged, is there any reason

why this case cannot -- the completion date for mediation can't be extended for, let's say, 75 or 90 days?

**MS. KHACHATOURIAN:** That's fine, Your Honor.

**MR. BUDAJ:** I think that would be fine with us, Your Honor. We certainly expected to go forward sooner, but we're okay with that.

**THE COURT:** I'm just setting a time limit.

**MR. BUDAJ:** Sure.

**THE COURT:** And then with respect to the rest of the case schedule here, you have proposed the next event would be the disclosure of invalidity contentions.

**MS. KHACHATOURIAN:** Your Honor, that's by court order. Essentially when plaintiff served premature infringement contentions, it triggered our deadline for invalidity contentions. So we made a miscellaneous admin request asking for more time, and your court ordered 90 days from the date we responded to the complaint, and we interpret that as filing a motion to dismiss. So we have calculated that date for August 1st.

**THE COURT:** August 1st, I see that.

Okay. So then what about the rest of this leading up through claim construction?

**MS. KHACHATOURIAN:** Your Honor, I think the main difference is, if you see, I believe, Dynatrace proposed December 15th as the claim construction hearing. I don't know

if you're available that day.  But the reason is, is plaintiff's schedule would cause us to have to prepare during the holidays and with any luck, I'm hoping not to do any work during that period and I'm sure the Court would prefer not to as well, and so that is the difference.

So I've actually moved the claims construction hearing up to avoid the holiday.

**THE COURT:**  To the 7th; is that right?

**MS. KHACHATOURIAN:**  Correct.

**MR. BUDAJ:**  So, Your Honor, our proposal is actually a little bit later; and to the extent we're talking about another 75 to 90 days in terms of a mediation, I think the proposal that we have on page -- it's marked page 13 of the JCMS, may make a little more sense, starting in the end of September for exchanging claim terms.

Part of this, Your Honor, just so you know, is that we both, Mr. Singer and I, will be engaged in a trial that's starting in October and so we tried to arrange these dates both to allow for the mediation that, you know, we had hoped would happen by now but we knew by this time wasn't going to happen and that we'd need a little more time for that, and also to account for our schedules through much of September.

To the extent there's an issue with the January 8, you know, or as soon thereafter as convenient for the court claim construction hearing date, obviously if Your Honor -- if the

Court wishes to have that a little later, we can adjust that.

THE COURT:  We can move that back and basically all take sort of a timeout during the holiday period --

MR. BUDAJ:  That will be fine.

THE COURT:  -- because I probably will want a tutorial, and it may be useful --

MR. BUDAJ:  Sure.

THE COURT:  -- maybe after that break to squeeze in a tutorial and a week after that have the actual -- so I'm inclined to maybe have that late January so everybody can proceed at the same pace.  But I'm inclined to adopt the later schedule just if nothing else, I want to give mediation a chance and I don't want to have the parties expend so much of their resources on this case before at least giving mediation a shot.

MS. KHACHATOURIAN:  So, Your Honor, should we -- perhaps you could give us a date for the claims construction hearing and then we can work back and submit a stipulation.

THE COURT:  Sure.

So either end of January or beginning of February, Betty.

THE CLERK:  We can do January 22nd, but if it's too early --

THE COURT:  I may actually not -- we should do it after that because I --

THE CLERK:  Okay.

**MS. KHACHATOURIAN:** In the middle of February I'm celebrating a special birthday in Disney World.

**THE COURT:** Okay.

**MS. KHACHATOURIAN:** Just so you know.

**THE COURT:** That sounds like fun.

**MS. KHACHATOURIAN:** I hope it is.

**THE COURT:** Can you hold the mediation there? No. How about the beginning of February, Betty?

**THE CLERK:** We can do it on February 4th.

**THE COURT:** Okay. February 4th.

**THE CLERK:** At 2:30. Is this the tutorial or --

**THE COURT:** Well, claim construction.

**THE CLERK:** Yeah, the claim construction. Okay.

**MS. KHACHATOURIAN:** Would Your Honor like the tutorial a week before?

**THE CLERK:** Two weeks before. So that would be the 22nd, January 22nd.

**MS. KHACHATOURIAN:** Okay.

**THE CLERK:** Let's do that at 2:30 as well.

**THE COURT:** Actually, I may be out that week, Betty. Can we do the tutorial, like, the 15th or something?

**THE CLERK:** The 15th? Okay. How about the 15th at 2:30. So January 15 at 2:30 --

**THE COURT:** Tutorial.

**THE CLERK:** -- for tutorial.

**THE COURT:**  And then the 4th --

**THE CLERK:**  And claim construction is the 4th at 2:30.

**MR. SINGER:**  Benjamin Singer, Your Honor.

And I know I've asked you this before and I apologize, but what is the Court's preferred tutorial setup?

**THE COURT:**  I like to do it term by term with each side having an opportunity to discuss each term.

And when you say "setup," are you talking about whether experts versus lawyers?

**MR. SINGER:**  Well, I assume that relates to the claim construction hearing.

**THE COURT:**  Oh, the tutorial.

**MR. SINGER:**  For the tutorial I think the court issue is whether Your Honor believes attorney description is useful or sees that as argument and requests submission of something else.

**THE COURT:**  Well, I don't want argument, but that doesn't necessarily preclude attorneys.  I've had attorneys who present these better than the Ph.D.  Really it's just a question of clarity and sometimes somebody who can reduce scientific terms to understandable terms is well-handled by an expert, sometimes it's better handled by counsel.  I've had it -- I don't have any hard-and-fast rules.

The premium is somebody able to explain this in a manner that I or any person on the street is going to be able to

understand.

MR. SINGER:  We'll see if we can find such a person, Your Honor.

THE COURT:  They are rare, I'll tell you that. Especially the technology here seems a bit complicated.

But so that's the order.  I will get out an order shortly because I want to get this thing moving.  And I'm going to get the referral out to the magistrate judge quickly so that any disputes you might have regarding scope of discovery, at least for purposes of mediation, can be resolved quickly.

MS. KHACHATOURIAN:  Your Honor, in terms of instructions or thoughts to the magistrate, both parties have indicated in the joint CMC that we would be open to staging discovery and perhaps first focusing on a mediation-related discovery.  So Dynatrace would respectfully request that that be part of whatever reference you're making.

THE COURT:  That's how I usually do things, and that may involve some, you know, critical documents.  I don't know. I don't know the case well enough, but my purpose is to get you the information you need in order to mediate, which is not the end-all, be-all.  If it doesn't mediate successfully, you'll have discovery in earnest.

MS. KHACHATOURIAN:  My only point is, as Your Honor probably already knows, the more money we spend, the less likely the case is going to resolve.

**THE COURT:**  Well, and that's why I normally stage discovery in that manner.  And, in fact, I think I will set a deadline of 75 days because I want to make sure you have enough time to do that and still have enough time to then open up discovery and do what you need to do in accordance with the claim construction schedule.

**MR. SINGER:**  We agree with that staging of discovery, Your Honor, but as has been the subject of much discussion today, one of the unique issues of this case is that it's not clear yet what products are going to be part of any settlement. So we will work within that framework.

I don't think the dispute is about the staging.  As you're probably familiar with this, the dispute will be about what's necessary and we'll take that up with one of the excellent magistrate judges.

**THE COURT:**  Right.  The magistrate judge will understand that's one of the issues here and hopefully can find a reasonable path that you can follow that doesn't impose an unreasonable burden but gets you the amount of information you need in order to mediate this case successfully.  All right?

**MR. SINGER:**  Thank you, Your Honor.

**MR. BUDAJ:**  Thank you, Your Honor.

**MS. KHACHATOURIAN:**  Thank you, Your Honor.

**THE COURT:**  All right.  Thank you.

**THE CLERK:**  Further CMC?

THE COURT:  Oh, and further CMC --

THE CLERK:  After the mediation?

THE COURT:  -- after the mediation.  Maybe 90 to 120 days out, Betty.

THE CLERK:  Okay.  October 25th at 10:30.

MR. BUDAJ:  I'm sorry.  What was that?  October?

THE CLERK:  October 25th at 10:30.

THE COURT:  All right.  We'll see you then.

MS. KHACHATOURIAN:  Thank you much very, Your Honor.

THE COURT:  Great.  Thank you.

(Proceedings adjourned at 4:00 p.m.)

---oOo---


**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   Monday, July 2, 2018


_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter