UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SOFTWARE RESEARCH, INC.,

Plaintiff,

v.

DYNATRACE LLC,

Defendant.

Case No. 18-cv-00232-EMC

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

Docket No. 39

## I.    INTRODUCTION

Plaintiff Software Research, Inc. ("SRI") initiated this patent infringement suit against Defendant Dynatrace LLC ("Dynatrace"), alleging that Dynatrace has directly, indirectly, and willfully infringed six of its patents—United States Patent Nos. 7,757,175 (the "'175 Patent"); 8,327,271 (the "'271 Patent"); 8,392,890 (the "'890 Patent"); 8,495,585 (the "'585 Patent"); 8,650,493 (the "'493 Patent"), and 8,984,491 (the "'491 Patent") (collectively, the "patents-in-suit"), and continue to do so through the present date. *See* Docket No. 31 ("FAC") ¶ 2.  Dynatrace moves to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that SRI has failed to "'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

On January 10, 2018, SRI filed this patent infringement suit against Dynatrace, and Dynatrace subsequently filed a motion to dismiss on April 4, 2018.  *See* Docket Nos. 1 and 27. SRI then filed an amended complaint ("FAC") on April 13, 2018, Dynatrace later withdrew its initial motion to dismiss to SRI's complaint and filed the instant motion to dismiss SRI's FAC. *See* Docket Nos. 31, 32, 39.

1    The patents-in-suit claim methods and systems for testing websites, and functionalities of a

2    test-enabled browser.  The following is an introductory extract on the technology at issue:

3            [A] user controls a test-enabled web browser via a set of pull-down
             menus, thereby choosing between alternative testing and analysis
4            functional capabilities, selecting files in which to store recordings
             (scripts), choosing files into which to place test results and
5            messages, and setting various parameters that affect how the testing
             and analysis functions are performed.  When the user requests it, the
6            representative embodiment provides for deep recording of user
             interactions as they relate to a specific web page currently on display
7            in the browser view area, for extracting key information from the
             current web page sufficient to validate that a future playback does or
8            does not produce the same effects on the chosen website page, for
             playing back a prior recording to confirm that a website page
9            continues to pass the user-defined tests, and for providing detailed
             analyses based on the specific contents of the current website page.
10           The general result of systematic use of the test-enabled browser on
             websites is improved content quality, demonstrated website server
11           behavior for deep tests, quicker delivery by the website server, and
             better serviceability for e-business.
12

13   *See* Docket No. 31-1 ("Exh. A") at 2; *see also* Docket No. 31-2 ("Exh. B") at 2.

14   SRI alleges that Dynatrace has violated 35 U.S.C. § 271(a) by directly infringing (i) claim

15   17 of the '175 Patent, (ii) claim 1 of the '271 Patent, (iii) claim 6 of the '890 Patent, (iv) claim 1 of

16   the '585 Patent, (v) claim 1 of the '493 Patent, and (vi) claim 1 of the '491 Patent.  *See* FAC ¶¶ 44,

17   66, 88, 110, 132, 154.  SRI also alleges that to the extent Dynatrace do not directly infringe the

18   above mentioned-patents, it contributes to infringement of the same under 35 U.S.C. § 271(c)

19   inasmuch as the "Infringing Products" offered for sale and sold by Dynatrace are each a

20   component of a patented machine or an apparatus used in practicing a patented process,

21   constituting a material part of SRI's invention, and Dynatrace knows the same to be especially

22   made or especially adapted for use in infringement of the patents-in-suit.  *See* FAC ¶¶ 46, 68, 90,

23   112, 134, 156.

24   SRI further alleges that Dynatrace has actively encouraged their customers to use its

25   products in an infringing manner, provided "detailed documentation instructing users on how to

26   use the products in an infringing manner," and actively induced patent infringement of the patents-

27   in-suit, in violation of 35 U.S.C. §271(b).  *See* FAC at ¶¶ 48-51, 70-73, 92-95, 114-117, 136-139,

28   158-161.

2

Lastly, SRI alleges that it has informed Dynatrace's predecessors-in-interest about the patents-in-suit, *see* FAC at ¶¶ 19, 22-25, 29-35, and Dynatrace has willfully infringed the patents-in-suit, in violation of 35 U.S.C. § 284. *See* FAC at ¶¶ 56, 78, 100, 122, 144, 166.

### III.     DISCUSSION

A.     Legal Standard

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quotation omitted). The Court accepts as true all well-pled factual allegations but does not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). It is well-settled that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Direct infringement allegations must be plausible under *Iqbal*, and "contain factual allegations that the accused product practices every element of at least one exemplary claim." *Novitaz Inc. v. inMarket Media, LLC,* 2017 WL 2311407, *3 (N.D. Cal. May 26, 2017); *see also e.Digital Corp.*, No. 15-CV-05790-JST, 2016 WL 4427209, *5 (FAC failed to state a claim where plaintiff "ha[d] not attempted to map [a] limitation onto any allegations in the FAC" and "based on the Court's own independent review, it cannot discern how the FAC could be said to plausibly allege this limitation"); *Atlas IP LLC v. Pac. Gas & Elec. Co.*, 2016 WL 1719545, *2 (N.D. Cal. Mar. 9, 2016) ("[S]imply reciting some of the elements of a representative claim and then describing generally how an accused product operates, without specifically tying the operation to any asserted claim or addressing all of the claim requirements, is insufficient."); *Atlas IP, LLC v. Exelon Corp.*, No. 15-cv-10746, 2016 WL 2866134, *5 (N.D. Ill. May 1, 2016) ("[F]actual allegations that do not permit a court to infer that the accused product infringes each element of at least one claim are not suggestive of infringement—they are merely compatible with

infringement."). "[F]ailure to meet a single limitation is sufficient to negate infringement of [a] claim." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).

When considering a motion to dismiss, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Although courts do not require "heightened fact pleading of specifics," *Twombly*, 550 U.S. at 570, a plaintiff must allege "'enough fact[s] to raise a reasonable expectation that discovery will reveal' the defendant is liable for the misconduct alleged." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1341 (Fed. Cir. 2012) (quoting Twombly, 550 U.S. at 556). "The party moving for dismissal has the burden of proving that no claim has been stated." *Lester v. Mineta*, No. 04-cv-3074-SI, 2006 WL 463515, at *2 (N.D. Cal. Feb. 24, 2006).

B.    Direct Infringement

1.    Whether SRI Has Sufficiently Identified the Accused Product(s)

In order to state a claim for direct infringement, a patent complaint "must identify the specific products accused." *Bender v. LG Elecs. U.S.A., Inc.*, No. 09-cv-2114-JF-PVT, 2010 WL 889541, at *4 (N.D. Cal. Mar. 11, 2010). Dynatrace argues that SRI's boilerplate allegations fail to plausibly allege direct infringement, and makes no specific factual allegations sufficient to identify an accused product or to explain its relevant functions. *See* Docket No. 39 ("Mot.") at 11. The FAC identifies the infringing products as,

> "Defendants' web application monitoring and scripting tool software
> products titled, upon information and belief, [Dynatrace
> Performance Management] and/or other related software products
> and services offered by Dynatrace."

FAC ¶¶ 44, 66, 88, 110, 132, 154. Dynatrace argues that SRI does not provide any facts to show that the allegedly infringing product, Dynatrace Performance Management ("DPM"), is actually a product and not simply a product or service category or marketing term and Dynatrace should not have to guess about what is at issue in this case, and SRI's failure to specify an accused product is fatal to its claims. *See* Mot. at 11. Dynatrace argues that SRI merely refers to a category of generic functionalities, such as testing, scripting, recording and playback, without specifying an

4

1  actual product, and as such, SRI's claims should be dismissed. *Id.*; *see also* FAC ¶¶ 44, 66, 88,

2  110, 132, 154.

3          Dynatrace's arguments are unpersuasive. SRI expressly defines the "Infringing Products"

4  as a "web application monitoring and scripting tool software products" and makes specific

5  reference to DPM. *See* FAC ¶ 44. SRI refers to that definition when alleging direct infringement.

6  *See* FAC ¶¶ 44, 66, 88, 110, 132, 154. Dynatrace's argument that SRI must identify specific

7  products by name in order for it to be able to respond is disingenuous. Dynatrace's own website

8  describes DPM and its functionality. When pressed at argument, Dynatrace's counsel could not

9  convincingly deny that DPM provided the functionality described in SRI's complaint. Nor could

10  counsel assert and identify any specific products under DPM rubric. Rather than providing any

11  explanation of what DPM is, Dynatrace only conclusorily asserts that DPM was merely a

12  marketing term. Dynatrace's evasive and amorphous description of DPM underscores the point

13  that SRI cannot be expected to identify a particular product name beyond DPM. Nor has

14  Dynatrace made a convincing showing that it cannot defend this suit without greater specificity in

15  the FAC. At bottom, Dynatrace appears to know what SRI is talking about when SRI identifies

16  DPM as the infringing product. Since the Court must "accept factual allegations in the complaint

17  as true and construe the pleadings in the light most favourable to the non-moving party," the Court

18  finds that SRI has sufficiently identified DPM as the accused product. *Manzarek v. St. Paul Fire*

19  *& Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

20          Cases cited by Dynatrace in support of its motion are neither dispositive nor persuasive.

21  *Cf. Big Baboon, Inc. v. SAP America, Inc.*, 2018 WL 1400443, *4 (N.D. Cal. Mar. 20, 2018)

22  (dismissing direct infringement claims "in the absence of a single factual allegation identifying a

23  specific infringing product" where plaintiff referred generally to "functionalities" incorporating

24  the patent)*; see also MACOM Tech. Solutions Holdings, Inc. v. Infineon Techs, AG,* 2017 WL

25  3449596, *5 (C.D. Cal. Jun. 5, 2017) (dismissing direct infringement claims and noting that

26  "reliance upon MACOM's general marketing claims is insufficient to state a plausible claim for

27  infringement.") In *Big Baboon, Inc. v. SAP America, Inc.*, No. 17-cv-2082-HSG, 2018 WL

28  1400443 (N.D. Cal. Mar. 20, 2018), the plaintiff generally alleged as the basis for both claims that

Defendants directly infringed and are infringing claims 15 and 20–34 of the '275 Patent by "making, using, or selling ... the inventions claimed in the '275 Patent"; the court then found that the plaintiff's allegations failed because "whenever the allegations assert infringement in the complaint, Plaintiff fail[ed] to identify an infringing product," and "whenever the allegations mention product families . . . they do not state that the product families infringe." *Id.* at *3. The FAC in this case is clearly distinguishable from *Big Baboon* as Dynatrace has identified DPM as the infringing product, and unlike the FAC in *Big Baboon*, the allegations are not "formulaic recitation of the elements of" direct infringement. *Iqbal*, 556 U.S. at 678; *see also* FAC ¶¶ 44, 66, 88, 110, 132, 154.

In *Bender*, 2010 WL 889541, the plaintiff "provide[d] a list of allegedly infringing products" that comprised approximately 20 broad categories of products, but no specific model names or even names of product lines; the broad and vague categories included, for example, "Desktop PCs," "Monitors," "PDAs," and "Home Theater Systems." *Id.* at *2. In contrast, the FAC identifies a particular product—DPM—and provides citations to specific infringing functionality of that product. *See* FAC ¶ 44. Dynatrace has not demonstrated DPM merely refers to a multitude of broad categories of products.

Finally, Dynatrace suggests that the facts of this case is analogous to *MACOM Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*, No. 16-cv-2859-CAS-PLAx, 2017 WL 3449596 (N.D. Cal. June 5, 2017) because SRI, like the counter-claimant in *MACOM*, relied upon Dynatrace's marketing materials to allege patent infringement, and this Court should find that "reliance upon [sic] general marketing claims is insufficient to state a plausible claim for infringement." *Id.* at *5. However, the court in *MACOM* did not find that the counter-claimant failed to identify the infringing products. Instead, the *MACOM* court dismissed the claims on the grounds that the counter-claimant failed to map any of the claim elements to MACOM's products. *Id.* at *6. Dynatrace's citation to this case is inapposite to SRI's identification of the accused product—DPM. Dynatrace fails to establish that DPM is simply marketing material and nothing more.

2.      Whether SRI Has Sufficiently Described the Functionality of the Accused

Product(s) and Tied It to the Asserted Claim Limitations

Apart from arguing that SRI has failed to sufficiently identify the accused product(s), Dynatrace argues that SRI's direct infringement claims are deficient because the FAC recites some claim elements and conclusory allegations that DPM "practices the method in the" patent or "consists of" the claim elements, and then cites to the same or similar "examples" from the alleged Dynatrace website without further explanation. *See* FAC ¶ 46. Dynatrace posits that these examples are in fact meaningless, out of context references to webpages that do not show that any particular claim limitations are plausibly met. *See Atlas IP LLC v. Pac. Gas and Elec. Co.*, Case No. 15-cv-05469-EDL, 2016 WL 1719545, *2 (N.D. Cal. Mar. 9, 2016) (noting that "simply reciting some of the elements of a representative claim and then describing generally how an accused product operates, without specifically tying the operation to any asserted claim or addressing all of the claim requirements, is insufficient" to withstand a motion to dismiss.).

By way of example, Dynatrace brings the Court's attention to direct patent infringement allegations with regards to claim 17 of the '175 patent, arguing that SRI did not even attempt to show or explain how "DPM" meets the limitations of the asserted claim:

> 17. A method for testing a website residing on a network using a test-enabled browser, said method comprising: accessing a website to be tested using the test-enabled browser; selecting a validation test to be performed; and performing the validation test using the test-enabled browser, wherein prior to said performing of the validation test for a particular web page, the particular web page is rendered by the test-enabled browser and examined so as to at least (i) extract details of the particular web page using Document Object Model (DOM) elements pertaining to the web page with their associated at least one index and their values, and (ii) store the details of the particular web page in a recorded script, and wherein during said performing, the particular web page is newly rendered by the test-enabled browser and details for the particular web page as newly rendered are com- pared to the stored details in the recorded script.

*See* Docket No. 31-1 ("Exh. A") at 17; *see also* Docket No. 39 at 12.

However, a comparison of the complaint and the claim limitations suggests that each claim limitation of the '175 Patent has been met by the DPM:

7

| Claim language ('175 patent, claim 17) | Accused product functionality (FAC ¶ 44) | Citation to Dynatrace materials (FAC ¶ 44) |
|---|---|---|
| A method for testing a website residing on a network using a test-enabled browser, said method comprising: | the method disclosed in the '175 Patent for testing a website residing on a network using a test-enabled browser | |
| accessing a website to be tested using the test-enabled browser; | by accessing a website to be tested using the test-enabled browser | (for example, DPM's synthetic monitoring tests a website by "[p]lay[ing] back scripted transactions," https://www.dynatrace.com/capabilities/synthetic- monitoring/, the website necessarily resides on a network, and DPM utilizes any number of browsers as its "test- enabled browser," https://www.dynatrace.com/technologies/) |
| selecting a validation test to be performed; and | selecting a validation test to be performed, such as the "Validate" and "Wait for Validation" functionality detailed in the literature available on Dynatrace's website | (for example, DPM's synthetic monitoring includes both a recorder and play back engine used to record and later select and play back validation tests, https://www.dynatrace.com/support/doc/synthetic/recorder /; https://www.dynatrace.com/support/doc/synthetic/recorder /using-the-web-recorder/recording-a-transaction/; https://www.dynatrace.com/support/doc/synthetic/recorder /using-the-web-recorder/reviewing-and-editing-a-transaction/; these validation tests include |

| Claim language ('175 patent, claim 17) | Accused product functionality (FAC ¶ 44) | Citation to Dynatrace materials (FAC ¶ 44) |
|---|---|---|
| | | "Validate" and "Wait for Validation" functionality, https://www.dynatrace.com/support/doc/synthetic/recorder /using-the-web-recorder/web-recorder-actions/; https://www.dynatrace.com/support/doc/synthetic/recorder /using-the-windows-recorder/script-actions/wait-script- action/; https://www.dynatrace.com/support/doc/synthetic/recorder /advanced-scripting-guide/script-actions-and- properties/validate-actions/) |
| performing the validation test using the test-enabled browser, | performing the selected validation test using the test- enabled browser | (for example, DPM's synthetic monitoring includes both a recorder and play back engine used to record and later select and play back validation tests, https://www.dynatrace.com/support/doc/synthetic/recorder /; https://www.dynatrace.com/support/doc/synthetic/recorder /using-the-web-recorder/recording-a-transaction/; https://www.dynatrace.com/support/doc/synthetic/recorder /using-the-web-recorder/reviewing-and-editing-a-transaction/) |
| wherein prior to said performing of the validation test for a particular web page, the particular web page is rendered by the | newly rendering the webpage to be tested by the test-enabled browser so as to extract details of that page using Document Object Model ("DOM") elements, and store the same in a recorded script, such as via the testing | (for example, the Validate and Wait for Validation functionality set forth above operates by "validat[ing] against" "a specific DOM element," https://www.dynatrace.com/support/doc/synthetic/recorder /using-the-web-recorder/web-recorder-actions/; |

| Claim language ('175 patent, claim 17) | Accused product functionality (FAC ¶ 44) | Citation to Dynatrace materials (FAC ¶ 44) |
|---|---|---|
| test- enabled browser and examined so as to at least (i) extract details of the particular web page using Document Object Model (DOM) elements pertaining to the web page with their associated at least one index and their values, and (ii) store the details of the particular web page in a recorded script, and | component of DPM | https://www.dynatrace.com/support/doc/synthetic/recorder /using-the-windows-recorder/script-actions/wait-script- action/; https://www.dynatrace.com/support/doc/synthetic/recorder /advanced-scripting-guide/script-actions-and- properties/validate-actions/) |
| wherein during said performing, the particular web page is newly rendered by the test-enabled browser and details for the particular web page as newly rendered are compared to the stored details in the recorded script. | and comparing the details in the newly rendered page against those stored in the recorded script | (for example, the Validate and Wait for Validation functionality set forth above operates by "validat[ing] against" "a specific DOM element," https://www.dynatrace.com/support/doc/synthetic/recorder /using-the-web-recorder/web-recorder-actions/; https://www.dynatrace.com/support/doc/synthetic/recorder /using-the-windows-recorder/script-actions/wait-script- action/; https://www.dynatrace.com/support/doc/synthetic/recorder /advanced-scripting-guide/script-actions-and- properties/validate-actions/) |

*See* Docket No. 41-1.  Contrary to Dynatrace's arguments that "SRI does not provide any factual

detail to make its direct infringement allegations plausible", the chart above clearly illustrates that

SRI has referenced specific product descriptions and functionalities of DPM to allege direct patent

infringement allegations.[1]

Dynatrace further argues that SRI has failed to address several of the elements in the

asserted claim 6 of the '890 Patent, and in claim 1 of the '493 Patent.  *See* Mot. at 12.  However,

Dynatrace provides little explanation in support of its arguments and fails to address how "several

of the elements" of claim 6 of the '890 Patent, and claim 1 of the '491 Patent, were not addressed

in the FAC.  Claim 6 of the '890 Patent reads:

> 6. A non-transitory computer readable medium including at least
> computer program code for providing a test enabled web browser,
> said computer readable medium comprising:
> computer program code for providing web browsing capabilities;
> and computer program code for testing capabilities of a website
> hosted by a server and accessible to the computer via a network,
> wherein the computer program code for testing capabilities of the
> website provides playback of one or more test scripts, the one or
> more test scripts being separate from the website,
> wherein the computer program code for testing capabilities is
> configured to keep track of named DOM element property values
> within a webpage of the website to provide support for playback of
> one or more test scripts that were recorded from and/or are played
> back via the test enabled web browser,
> wherein the use of the named DOM element property values
> provides support for synchronizing playback of the one or more test
> scripts and allows the computer program code for testing capabilities
> of the website of the test enabled web browser to compensate for at
> least a portion of the webpage being dynamically generated by
> AJAX programming, and
> wherein at least one command is provided in the one or more test
> scripts, and the at least one command operates, when performed, to:
> find a current index of at least one DOM element of the webpage
> based on a specified property name and/or property value; and (i)
> submit a named event to the at least one DOM element of the
> webpage having the current index, or (ii) insert or verify a value in
> the at least one DOM element of the webpage having the current
> index.

---

[1] Dynatrace also argues that "SRI truncates and omits portions of the limitations (for example, SRI
appears to omit the order of performing the validation test step even though claim 17 of the '175
Patent states that the particular web page is rendered "prior to" the test)".  *See* Docket No. 42 at 4.
Dynatrace's arguments are unpersuasive since the FAC states that the "test-enabled browser newly
[renders] the webpage to be tested," *see* FAC ¶ 44, which suggests that the web page is rendered
"prior to" the test.

See Docket No. 31-3 at 20. It appears that each of the claim limitations have been addressed in the FAC:

> Defendants have been, and are currently, directly infringing at least claim 6 of the '890 Patent in violation of 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, selling, and offering for sale Defendants' Infringing Products, which, as set forth in documentation available on Defendants' website, consist of non-transitory computer readable media—both as maintained in Defendants' files and those of the users to whom Defendants offer and sell the Infringing Products—including at least *computer program code* stored therein for providing a test-enabled web browser, said medium comprising computer program code for providing web browsing capabilities for example, *DPM's synthetic monitoring tests a website by "[p]lay[ing] back scripted transactions,"* https://www.dynatrace.com/capabilities/synthetic-monitoring/, *the website necessarily resides on a network, and DPM utilizes any number of browsers as its "test-enabled browser,"* https://www.dynatrace.com/technologies/); computer program code for testing capabilities of a website hosted by a server and accessible to the computer via a network wherein the computer program code for testing capabilities of the website provides playback of one or more test scripts, including through the testing component of the Infringing Products, the one or more test scripts being separate from the website (*for example, DPM's synthetic monitoring includes both a recorder and play back engine used to record and later select and play back validation tests, play back engine used to record and later select and play back validation tests,* https://www.dynatrace.com/support/doc/synthetic/recorder/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/recording-a-transaction/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/reviewing-and-editing-a-transaction/); wherein the computer program code for testing capabilities is *configured to keep track of named DOM element property values within a webpage of the website* to provide support for playback of one or more test scripts that were recorded from and/or are played back via the test enabled web browser, wherein the use of the named DOM element property values provides support for synchronizing playback of the one or more test scripts and allows the computer program code for testing capabilities of the website of the test enabled web browser to compensate for at least a portion of the webpage being dynamically generated by AJAX programming (*for example, DPM's synthetic monitoring includes both a recorder and play back engine used to record and later select and play back validation tests,* https://www.dynatrace.com/support/doc/synthetic/recorder/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/recording-a-transaction/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/reviewing-and-editing-a-transaction/; *these validation tests include "Validate" and "Wait for Validation" functionality that operate by "validat[ing] against" a specific DOM element,"* https://www.dynatrace.com/support/doc/synthetic/recorder/using-

United States District Court
Northern District of California

the-web-recorder/web-recorder-actions/;
https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-windows-recorder/script-actions/wait-script-action/;
https://www.dynatrace.com/support/doc/synthetic/recorder/advanced-scripting-guide/script-actions-and-properties/validate-actions/));
and wherein at least one command is provided in the one or more test scripts, and the at least one command operates, when performed, to find a current index of at least one DOM element of the webpage based on a specified property name and/or property value, and (i) submit a named event to the at least one DOM element of the webpage having the current index, or (ii) insert or verify a value in the at least one DOM element of the webpage having the current index, such as through the "Validate" and "Wait for Validation" features described in Defendants' technical literature (***for example, the Validate and Wait for Validation functionality set forth above operates by "validat[ing] against" "a specific DOM element,"*** https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/web-recorder-actions/;
https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-windows-recorder/script-actions/wait-script-action/;
https://www.dynatrace.com/support/doc/synthetic/recorder/advanced-scripting-guide/script-actions-and-properties/validate-actions/), as disclosed in the '890 Patent.

*See* FAC ¶ 88 (emphasis added). A comparison of the asserted claim 6 of the '890 Patent and the FAC reveals that each claim limitation has been addressed in the FAC (*e.g.* a computer program code, a playback mechanism, a command that tests one or more scripts, and the verification of DOM elements):

| Claim language ('890 patent, claim 6) | Accused product functionality (FAC ¶ 88) | Citation to Dynatrace materials (FAC ¶ 88) |
|---|---|---|
| A non-transitory computer readable medium including at least computer program code for providing a test enabled web browser, | consist of non-transitory computer readable media, [sic], including at least computer program code stored therein for providing a test-enabled web browser, | |

| Claim language ('890 patent, claim 6) | Accused product functionality (FAC ¶ 88) | Citation to Dynatrace materials (FAC ¶ 88) |
|---|---|---|
| said computer readable medium comprising: | | |
| computer program code for providing web browsing capabilities; and | computer program code stored therein for providing a test-enabled web browser, computer program code stored therein for providing a test-enabled web browser, said medium comprising computer program code for providing web browsing capabilities | (for example, DPM's synthetic monitoring tests a website by "[p]lay[ing] back scripted transactions," https://www.dynatrace.com/capabilities/synthetic-monitoring/, the website necessarily resides on a network, and DPM utilizes any number of browsers as its "test-enabled browser," https://www.dynatrace.com/technologies/) |
| computer program code for testing capabilities of a website hosted by a server and accessible to the computer via a network, wherein the computer program code for testing capabilities of the website provides playback of one or more | computer program code for testing capabilities of a website hosted by a server and accessible to the computer via a network wherein the computer program code for testing capabilities of the website provides playback of one or more test scripts, including through the testing component of the Infringing Products, the one or more test scripts being separate from the website | (for example, DPM's synthetic monitoring includes both a recorder and play back engine used to record and later select and play back validation tests, play back engine used to record and later select and play back validation tests, https://www.dynatrace.com/support/doc/synthetic/recorder/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/recording-a-transaction/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/reviewing-and-editing-a-transaction/) |

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Claim language ('890 patent, claim 6) | Accused product functionality (FAC ¶ 88) | Citation to Dynatrace materials (FAC ¶ 88) |
|---|---|---|
| test scripts, the one or more test scripts being separate from the website, | | |
| wherein the computer program code for testing capabilities is configured to keep track of named DOM element property values within a webpage of the website to provide support for playback of one or more test scripts that were recorded from and/or are played back via the test enabled web browser, | wherein the computer program code for testing capabilities is configured to keep track of named DOM element property values within a webpage of the website to provide support for playback of one or more test scripts that were recorded from and/or are played back via the test enabled web browser, | (for example, DPM's synthetic monitoring includes both a recorder and play back engine used to record and later select and play back validation tests, https://www.dynatrace.com/support/doc/synthetic/recorder/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/recording-a-transaction/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/reviewing-and-editing-a-transaction/;) |
| wherein the use of the named DOM element property values provides | wherein the use of the named DOM element property values provides support for synchronizing playback of the one or more test scripts and | (these validation tests include "Validate" and "Wait for Validation" functionality that operate by "validat[ing] against" "a specific DOM element," https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/web- |

| Claim language ('890 patent, claim 6) | Accused product functionality (FAC ¶ 88) | Citation to Dynatrace materials (FAC ¶ 88) |
|---|---|---|
| support for synchronizing playback of the one or more test scripts and allows the computer program code for testing capabilities of the website of the test enabled web browser to compensate for at least a portion of the webpage being dynamically generated by AJAX programming, and | allows the computer program code for testing capabilities of the website of the test enabled web browser to compensate for at least a portion of the webpage being dynamically generated by AJAX programming | recorder-actions/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-windows-recorder/script-actions/wait-script-action/; https://www.dynatrace.com/support/doc/synthetic/recorder/advanced-scripting-guide/script-actions-and-properties/validate-actions/) |
| wherein at least one command is provided in the one or more test scripts, and the at least one command operates, when performed, to: find a current index of at least one DOM element of the webpage based | wherein at least one command is provided in the one or more test scripts, and the at least one command operates, when performed, to find a current index of at least one DOM element of the webpage based on a specified property name and/or property value, and (i) submit a named event to the at least one DOM element of the webpage having the | (for example, the Validate and Wait for Validation functionality set forth above operates by "validat[ing] against" a specific DOM element," https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/web-recorder-actions/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-windows-recorder/script-actions/wait-script-action/; https://www.dynatrace.com/support/doc/synthetic/recorder/advanced-scripting-guide/script-actions-and-properties/validate-actions/) |

| Claim language ('890 patent, claim 6) | Accused product functionality (FAC ¶ 88) | Citation to Dynatrace materials (FAC ¶ 88) |
|---|---|---|
| on a specified property name and/or property value; and (i) submit a named event to the at least one DOM element of the webpage having the current index, or (ii) insert or verify a value in the at least one DOM element of the webpage having the current index. | current index, or (ii) insert or verify a value in the at least one DOM element of the webpage having the current index, such as through the "Validate" and "Wait for Validation" features described in Defendants' technical literature | |

*See* Docket No. 31-3 at 20; *see also* FAC ¶ 88. As evidenced in the chart above, there are numerous references to DPM which map the functionalities of DPM to the claim limitations of the asserted claim 6 of the '890 patent.

Dynatrace also argues that SRI has failed to address several elements in claim 1 of the '493 Patent but provides little explanation to support its argument. *See* Mot. at 12. Claim 1 of the '493 Patent reads:

> 1. A non-transitory computer readable medium including at least computer program code stored therein for providing a test-enabled browser for testing a website residing on a network, said computer readable medium comprising:
> computer program code for interfacing with web browsing components, the web browsing components including Document Object Model (DOM) access methods included in Dynamic Linked Libraries associated with a browser code library;
> computer program code for accessing a website to be tested;
> computer program code for rendering and examining at least one web page of the website so as to at least (i) extract details of

17

elements of the web page, and (ii) store the details of the web page in a recorded script;
computer program code for selecting a validation test to be performed; and
computer program code for performing the validation test using at least one of the DOM access methods of the web browsing components, wherein during the validation test, the at least one web page is newly rendered and details of elements for the at least one web page as newly rendered are accessed via the at least one of the DOM access methods and compared to the stored details in the recorded script.

*See* Docket No. 31-5 at 16-17.  In comparison with the FAC, it appears that each claim limitation has been met:

| Claim language ('493 patent, claim 1) | Accused product functionality (FAC ¶ 132) | Citation to Dynatrace materials (FAC ¶ 132) |
|---|---|---|
| A non-transitory computer readable medium including at least computer program code stored therein for providing a test-enabled browser for testing a website residing on a network, said computer readable medium comprising: | consist of non-transitory computer readable media [sic] including at least computer program code stored therein for providing a test-enabled browser for testing a website residing on a network | |
| computer program code for interfacing with web browsing components, | said medium comprising computer program code for interfacing with web browsing components, the web browsing components | (for example, DPM's synthetic monitoring tests a website by "[p]lay[ing] back scripted transactions," https://www.dynatrace.com/capabilities/synthetic-monitoring/, the website necessarily resides |

United States District Court
Northern District of California

| Claim language ('493 patent, claim 1) | Accused product functionality (FAC ¶ 132) | Citation to Dynatrace materials (FAC ¶ 132) |
|---|---|---|
| the web browsing components including Document Object Model (DOM) access methods included in Dynamic Linked Libraries associated with a browser code library; | including DOM access methods | on a network, and DPM utilizes any number of browsers as its "test-enabled browser," https://www.dynatrace.com/technologies/); |
| computer program code for accessing a website to be tested; | computer program code for accessing a website to be tested | (for example, DPM's synthetic monitoring tests a website by "[p]lay[ing] back scripted transactions," https://www.dynatrace.com/capabilities/synthetic-monitoring/, the website necessarily resides on a network, and DPM utilizes any number of browsers as its "test-enabled browser," https://www.dynatrace.com/technologies/); |
| computer program code for rendering and examining at least one web page of the website so as to at least (i) extract details of elements of the web page, and (ii) store the details of the web page in a recorded script; | computer program code for rendering and examining at least one web page of the website so as to extract details of elements of the web page, and store the details of the web page in a recorded script, such as via the testing component of the Infringing Products | (for example, DPM's synthetic monitoring includes both a recorder and play back engine used to record and later select and play back validation tests, https://www.dynatrace.com/support/doc/synthetic/recorder/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/recording-a-transaction/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/reviewing-and-editing-a-transaction/); |

| Claim language ('493 patent, claim 1) | Accused product functionality (FAC ¶ 132) | Citation to Dynatrace materials (FAC ¶ 132) |
|---|---|---|
| computer program code for selecting a validation test to be performed; and | computer program code for selecting a validation test to be performed, such as the "Validate" and "Wait for Validation" features described in Defendants' technical documentation | (for example, DPM's synthetic monitoring includes both a recorder and play back engine used to record and later select and play back validation tests, https://www.dynatrace.com/support/doc/synthetic/recorder/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/recording-a-transaction/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/reviewing-and-editing-a-transaction/; these validation tests include "Validate" and "Wait for Validation" functionality, https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/web-recorder-actions/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-windows-recorder/script-actions/wait-script-action/; https://www.dynatrace.com/support/doc/synthetic/recorder/advanced-scripting-guide/script-actions-and-properties/validate-actions/); |
| computer program code for performing the validation test using at least one of the DOM access methods of the web browsing components, wherein during the validation test, the at least one web page is newly rendered and details of elements for the at least one web | and computer program code for performing the validation test using at least one of the DOM access methods of the web browsing components, wherein during the validation test, the at least one web page is newly rendered and details of elements for the at least one web page as newly rendered are accessed via the at least one of the DOM access methods and compared to the stored | (for example, the Validate and Wait for Validation functionality set forth above operates by "validat[ing] against" "a specific DOM element," https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/web-recorder-actions/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-windows-recorder/script-actions/wait-script-action/; https://www.dynatrace.com/support/doc/synthetic/recorder/advanced-scripting-guide/script-actions-and-properties/validate-actions/), |

| Claim language ('493 patent, claim 1) | Accused product functionality (FAC ¶ 132) | Citation to Dynatrace materials (FAC ¶ 132) |
|---|---|---|
| page as newly rendered are accessed via the at least one of the DOM access methods and compared to the stored details in the recorded script. | details in the recorded script | |

*See* Docket No. 31-5 at 16-7; *see also* FAC ¶ 132.[2]  The charts above clearly illustrate how SRI has mapped DPM's functionalities onto the elements of the asserted claims.  Dynatrace has failed to address how any claim limitations has not been addressed in the FAC and the Court thus finds that SRI has pled sufficient factual detail to make its direct infringement allegations plausible.  *See*

---

[2] Dynatrace argues that SRI truncates and omits portions of the limitations and by way of example, brings the Court's attention to claim 1 of the '493 Patent, arguing that SRI makes no reference to "browser code library".  *See* Docket No. 42 at 4.  SRI's failure to reference "browser code library" is not dispositive.  The operative part of the claim limitation of claim 1 of the '493 Patent requires "computer program code for interfacing with web browsing components, the web browsing components including Document Object Model (DOM) access methods included in Dynamic Linked Libraries associated with a browser code library"; the FAC alleges "computer program code for interfacing with web browsing components, the web browsing components including Document Object Model (DOM) access methods."  *See* FAC ¶ 132; compare with Docket No. 31-5 at 16-7.  In other words, the operative element of claim 1 of the '493 Patent might be construed as illustrative of the DOM access methods, "[which are] included in Dynamic Linked Libraries associated with a browser code library", and not the "browser code library" itself.  *See id.*  The specifications in the '493 Patent emphasizes the DOM element.  *See* Docket No. 31-5 at 16 ("A method for extracting details from a current page, e.g. text, or image checksums, or HTML item count, etc. This is *accomplished using the Document Object Model (DOM) available within the underlying Windows environment that emulates operation of the IE technology.*  In one embodiment, a current page is analyzed for properties of interest to the user, as specified and selected with user pull-down menus, and the required data is recorded into a script file for later comparative use during playback.") (emphasis added).  In any case, Dynatrace's argument that "browser code library" is part of the claims limitation is a matter for claim construction.

FAC ¶¶ 44, 66, 88, 110, 132, 154; *see also Lester v. Mineta*, no. 04-cv-3074-SI, 2006 WL 463515, at *2 (N.D. Cal. Feb. 24, 2006) ("The party moving for dismissal has the burden of proving that no claim has been stated.").

Since SRI has (i) sufficiently identified the accused product—DPM, and (ii) sufficiently described the functionality of DPM and tied it to the claim limitations in the patents-in-suit, the Court **DENIES** Dynatrace's motion to dismiss with regards to SRI's direct infringement allegations.

C.      Indirect Infringement/Willful Infringement

Apart from the direct infringement allegations, Dynatrace also moves the Court to dismiss the indirect infringement allegations (both inducing infringement and contributory infringement under 35 U.S.C. § 271(b) and § 271(c)) and willful infringement allegations under 35 U.S.C. § 284.

1.      Inducing Infringement (35 U.S.C. § 271(b))

35 U.S.C. § 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." Liability under Section 271(b) "can only attach if the defendant knew of the patent and knew as well that 'the induced acts constitute patent infringement." *See Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926-28 (2015) (quoting *Global- Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011)); *see also Radware, Ltd. v. A10 Networks, Inc.*, 2013 WL 5373305, *2-4 (N.D. Cal. Sept. 24, 2013), (dismissing all claims for indirect infringement based on activities occurring before knowledge of patent-in-suit). Dynatrace argues that the FAC has not sufficiently pled Dynatrace's pre-suit knowledge. *See* Mot. at 13-14. On the other hand, SRI argues that it has pled SRI argues that it has pled a "constellation of facts" demonstrating Dynatrace had pre-suit knowledge of the patents-in-suit: (i) letters were sent from SRI to three different predecessors-in-interest to Dynatrace regarding SRI's patent portfolio, FAC ¶¶ 17–25, (ii) SRI entered into a Mutual Nondisclosure Agreement to share confidential technical information with one of those predecessors-in-interest, *id.* ¶ 26, (iii) six different patent applications filed by another predecessor-in-interest cite to SRI's patent portfolio, FAC ¶¶ 30–35, and (iv) during prosecution of a seventh patent application filed by that same predecessor-in-

interest, the U.S. PTO rejected the application as being unpatentable over, *inter alia*, a "published application of the parent application of [certain of] the [patents-in-suit]." FAC ¶¶ 27–29; *see also* Docket No. 41 at 11. SRI's arguments are unpersuasive for several reasons.

### a. Content and Context of Letters

First, two of the three letters were sent nearly a decade ago to other companies that do not mention any of the asserted patents, but merely patent applications, which eventually became a patent that is not amongst the patents-in-suit. *See* FAC ¶¶ 17-25. It appears that only one letter referenced applications that matured into certain patents-in-suit, but there is limited detail with regards the contents of this letter. *See* FAC ¶ 20-22. A patent application does not provide notice of the resulting patent for indirect or willful infringement, and certainly not when application is not for the patent-in-suit. *See VIA Techs., Inc. v. ASUS Computer Int'l*, 2015 WL 3809382, *3 (N.D. Cal. Jun. 18, 2015) ("The general rule in this district is that knowledge of a patent application alone is insufficient to meet the knowledge requirement for either a willful or induced infringement claim."); *see also State Indus., Inc. v. A.O. Smith Corp*., 751 F.2d 1226, 1236 (Fed. Cir. 1986) ("[f]iling an application is no guarantee any patent will issue and a very substantial percentage of applications never result in patents. What the scope of the claims in patents that do issue will be is something totally unforeseeable.") As (i) the letters were sent before the patents existed, (ii) the content of the letters referenced a patent application which became a patent not asserted in this case, and (iii) "[t]he requisite knowledge of the patent allegedly infringed simply cannot be inferred from mere knowledge of other patents, even if somewhat similar," or from "alleged awareness of the [ ] patent application," *Vasudevan Software, Inc. v. TIBCO Software Inc.*, No. 11–6638, 2012 WL 1831543 at *3 (N.D. Cal. May 18, 2012), the content and context of the letters here provide no plausible basis for inferring that Dynatrace had pre-suit knowledge of any of the patents-in-suit.

### b. Predecessors-in-Interest

Second, even if the Court finds that the content and context of the letters form a plausible basis for inferring Dynatrace's pre-suit knowledge, the communications between SRI and Dynatrace's predecessors-in-interest do not establish that Dynatrace knew of any of the patents-in-

suit. In *SoftView LLC v. Apple Inc.*, Civ. No. 10-389-LPS, 2012 WL 3061027, *5 (D. Del. 2012), the court found that the allegation that a defendant had pre-suit knowledge of a patent because its subsidiary "had cited the published application of the parent application of the [patent-at-issue] during the prosecution of one of [the subsidiary's] own patents[,]" did not provide a plausible basis to infer the defendant's knowledge of the patent. Similarly in *Varian Medical Systems, Inc. v. Elekta AB*, 2016 WL 3748772 at *5 (D. Del. 2016), the court found that the "[p]laintiff needs to set out more than just the bare fact of the parent/subsidiary relationship in order to make out a plausible claim that" subsidiary's knowledge can be imputed to the parent. Here, SRI pleads that Keynote Systems, Gomez, and Compuware, are Dynatrace's predecessors-in-interest but provide no details as to the nature of the relationship between those entities and Dynatrace. We do not know, for instance, whether these companies were only those whose assets were acquired or whether they were part of a merger with Dynatrace. *See* FAC ¶¶ 17-28. We know nothing about any due diligence Dynatrace may have performed in connection with the prior succession. Nor do we know whether these entities were part of a long chain of predecessors several steps removed from Dynatrace. It is thus implausible to infer from the complaint that Dynatrace had pre-suit knowledge from communications between SRI and Dynatrace's predecessors.

### c. Constellation of Facts

Third, the Court finds that SRI's pleadings do not amount to a "constellation of facts" sufficient to find pre-suit knowledge. *See* Docket No. 41 at 11; *cf. Softview LLC v. Apple Inc.*, Civ. No. 10-389-LPS, 2012 WL 3061027, *5-6 (D. Del. July 2012) (finding three different alleged bases of pre-suit knowledge to be, individually, "inadequate allegations," but denying motion to dismiss because, "[t]aken in combination, the Court conclude[d] that Softview has alleged a plausible basis from which one might reasonable infer that AT&T had knowledge of the patents-in-suit prior to this litigation.") While the court in *Softview*[3] found that three separately inadequate

---

[3] First, SoftView alleged that AT&T became aware of the '353 patent through its subsidiary, BellSouth Intellectual Property Corp., which previously had cited the published application of the parent application of the '353 patent during the prosecution of one of its own patents. Second, SoftView alleged that AT&T also acquired pre-suit knowledge of the '353 patent through its connection with inventor and SoftView General Manager Gary Rohrabaugh. Third, SoftView contended that AT&T learned of the '353 patent from Apple in the course of its relationship with

allegations, when taken in combination, could amount to plausible basis to infer knowledge, the Court finds that the facts— the letters sent from SRI to three different predecessors-in-interest which do not discuss the patents-in-suit, the mutual nondisclosure agreement between SRI and one of Dynatrace's predecessors-in-interest, and the various patent applications—could not amount, even in the aggregate, to a plausible basis from which Dynatrace's pre-complaint knowledge may reasonably be inferred.

Thus, the Court **GRANTS** Dynatrace's motion to dismiss with regards to SRI's inducing infringement allegations as to pre-filing conduct.

d.      Specific Intent and Post-Filing conduct

The Court next considers whether SRI has pled sufficiently for its inducing infringement allegations with regards to Dynatrace's post-filing conduct. Dynatrace argues that SRI has not pled sufficient facts to show that Dynatrace specifically intended others to infringe. *See* Mot. at 15; *see also Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1368 (Fed. Cir. 2017) (citations omitted) ("mere knowledge of acts alleged to constitute infringement is not sufficient; rather the plaintiff must show "specific intent and action to induce infringement.") Dynatrace argues that SRI alleges that Dynatrace has unspecified "detailed documentation instructing users on how to use the Infringing Products in an infringing manner," but fails to provide it, explain its content or how it shows that Dynatrace specifically intended infringement. *See* Mot. at 15; *see also* FAC ¶ 48. Dynatrace cites to *CAP Co., Ltd. v. McAfee, Inc.*, No. 14-cv-5068-JD, 2015 WL 3945875, at *15 (N.D. Cal. June 26, 2015) and argues that SRI, like the plaintiff CAP made passing references to "user manuals guides, and support articles," without ever saying what those materials contain. *Id.* The facts of this case, however, are not analogous to *CAP*. SRI has pled numerous references to public material on Dynatrace's website, which gives rise to an inference of specific intent. For instance, for the claim limitation "selecting a validation test to be performed; and performing the validation test using the test-enabled browser" under claim 17 of the '175

---

Apple as the exclusive seller of the iPhone from June 2007 to March 2009, based on Apple's previous discussions with SoftView involving the '353 patent. SoftView similarly alleged that AT&T also learned of the '926 patent through its exclusive relationship with Apple.

25

Patent, Dynatrace's materials recite step-by-step instructions, including specific steps as to how to "record [a user's] transaction" with a webpage, steps following that which include "play[ing] back the transaction", including "1. On the action's detail page, click Add Custom Validation to display the validation fields[;] 2. Select the validation type from the Criteria list [sic][;] 3. Type the validation string in the specify text field[;] 4. If you selected to [m]atch against an element, click Add Locator to define the element locators. Select whether the locator is CSS, DOM or XPath type . . ." *See e.g. FAC ¶ 44*; *see also*

https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-web-recorder/web-recorder-actions/; https://www.dynatrace.com/support/doc/synthetic/recorder/using-the-windows-recorder/script-actions/wait-script-action/;

https://www.dynatrace.com/support/doc/synthetic/recorder/advanced-scripting-guide/script-actions-and-properties/validate-actions/. Contrary to Dynatrace's arguments, there are detailed allegations as to how Dynatrace instructed its users, giving rise to a plausible inference that Dynatrace specifically intended others to infringe the patents-in-suit.

The Court **GRANTS** Dynatrace's motion to dismiss with regards to SRI's inducing infringement allegations as to pre-filing conduct, but **DENIES** it as to post-filing conduct.

2.      Contributory Infringement (35 U.S.C. § 271(c))

"In order to state a claim for contributory infringement, a complaint must further plead (in addition to knowledge) that the accused product "has no substantial non-infringing uses, and is known by the [defendant] to be especially made or especially adapted for use in an infringement" of the patents-in-suit." *In re Bill of Lading*, 681 F. 3d at 1337. A plaintiff "need not prove that the accused products have no substantial non-infringing uses at the pleading stage; rather it must allege some facts that take its statements from mere lawyerly fiat to a plausible conclusion—for example, by alleging one or more infringing uses of the accused products and alleging that the products have no other uses." *Id.* at *6 (internal citations omitted).

Dynatrace argues that the Court should dismiss the contributory infringement claims on the grounds that SRI (a) has not plausibly alleged direct infringement, (b) has not shown pre-suit notice of the patents and knowledge that its acts contribute to the alleged infringement, (c) never

26

states any non-conclusory facts showing Dynatrace knew that an actual accused product (beyond general functionalities) was "especially made or adapted to infringe," *In re Bill of Lading,* 681 F. 3d at 1337, and (d) does not allege that it lacks substantial non-infringing uses. *See* Mot. at 16-17. With regards to (a), as discussed above, the Court finds that SRI has plausibly alleged direct infringement. With regards to (b), as mentioned above, the Court finds that SRI has not alleged facts plausibly showing that pre-suit knowledge of the patents-in-suit. With regards to (c) and (d), to the extent SRI's contributory infringement claims survive based on post-filing conduct as to knowledge, the question is whether SRI has sufficiently pled that DPM, the infringing product, was "especially made or adapted to infringe the patents-in-suit." *In re Bill of Lading,* 681 F. 3d at 1337. The FAC pleads that Dynatrace knows the infringing products to be "especially made or especially adapted for use in infringement," and that "DPM's synthetic monitoring, when used in its normal and intended usage (pursuant to the instructions set forth on Dynatrace's website), infringes . . . ." FAC ¶ 44-46; *see also* FAC ¶¶ 66-68, 88-90, 110-112, 132-134, 154-156. The FAC sufficiently suggests that there are no other substantial uses of DPM that do not infringe. Thus, the Court **GRANTS** Dynatrace's motion to dismiss SRI's contributory infringement claims with regards to the Dynatrace's pre-filing conduct, but **DENIES** it with respect to post-filing conduct.

### 3. Willful Infringement

SRI alleges that Dynatrace has willfully infringed the patents-in-suit, in violation of 35 U.S.C. § 284. *See* FAC at ¶¶ 56, 78, 100, 122, 144, 166. Recovery of enhanced damages for willful patent infringement is governed by 35 U.S.C. § 284 as interpreted by the United States Supreme Court in *Halo Elecs., Inc. v. Pulse Elecs., Inc*., 136 S. Ct. 1923, 1935 (2016). In *Halo*, the Supreme Court held that the "sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad- faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id*. at 1932. Thus, under *Halo*, while "courts should continue to take into account the particular circumstances of each case," enhanced damages are generally limited to "egregious cases of misconduct beyond typical infringement," such as those "typified by willful misconduct." *Id*. at 1933-35. In addition, the Federal Circuit has confirmed that "[k]nowledge of the patent alleged to be willfully infringed continues to be a

prerequisite to enhanced damages." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016).

SRI argues that the FAC has pled "specific factual allegations about [a defendant's] subjective intent, or any other aspect of [defendant's] behavior that would suggest its behavior was egregious." *Finjan, Inc. v. Cisco Systems, Inc.*, no. 17-cv-72-BLF, 2017 WL 2462423, at *5 (N.D. Cal. June 7, 2017). SRI draws the Court to the following paragraph(s) in the FAC:

> Defendants' infringement has been and is willful and, pursuant to 35 U.S.C. § 284, SRI is entitled to treble damages. Defendants' willful infringement is based at least on Defendants' knowledge of SRI, its products, and its patents since at least as early as 2009 as set forth above. Defendants have either willfully and wantonly infringed the '175 Patent or have recklessly avoided knowledge of their own infringement, even when faced with knowledge of SRI's own products and patents.

FAC, ¶ 56, 78, 100, 122, 144, 166. These allegations are insufficient under the standard in *Halo* and may be contrasted from *Finjan*. In *Finjan*, Finjan alleged a more than twenty year direct relationship between itself and the defendant that included contracts, presentations, and discussion of the patent portfolio and that the defendant was an investor in Finjan for years before the suit. *See Finjan*, 2017 WL 2462423, at *2 (N.D. Cal. Jun. 2017). Those allegations in *Finjan* are more detailed and included a more direct relationship than the parties in this case and even then, the *Finjan* court found the allegations insufficient for a willful infringement claim. The *Finjan* court explained that the complaint "makes no specific factual allegations about Cisco's subjective intent, or any other aspects of Cisco's behavior that would suggest its behavior was 'egregious.'" *Id.*, at *5 ("because Finjan has failed to make sufficient factual allegations that it had pre-suit knowledge of the Asserted Patents or that Cisco's behavior was "egregious ... beyond typical infringement," it has failed to state a claim for willful infringement."). As noted above, SRI fails to plausibly allege pre-suit knowledge by Dynatrace. SRI does not allege that it notified Dynatrace of any of the asserted patents themselves or discussed them with Dynatrace before filing suit. Hence, SRI does not allege facts which amount to "willful, wanton, malicious, bad- faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Halo* at 1932. The Court thus **GRANTS** Dynatrace's motion to dismiss SRI's willful infringement claims.

D.     Prayer for Injunctive Relief

Lastly, Dynatrace argues in a footnote that SRI's prayer for injunctive relief should also be dismissed and/or stricken, given its status as a non-practicing entity ("NPE"). However, Dynatrace cites no allegations or evidence establishing that SRI is a non-practicing entity. *See* Mot. at 19; *see also* Docket No. 42 at 8. SRI has alleged that it exploits the patents-in-suit "by making, marketing, selling, and using products covered by the" patents-in-suit, "including its popular eValid™ software products." FAC ¶¶ 40, 62, 84, 106, 128, 150. In support of its legal argument, Dynatrace cites *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). The Supreme Court in *eBay* held that:

> The traditional four-factor test applied by courts of equity when considering whether to award permanent injunctive relief to a prevailing plaintiff applies to disputes arising under the Patent Act. That test requires a plaintiff to demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*See id.* But the Court cannot find as a matter of law on a motion to dismiss that SRI cannot satisfy the *eBay* criteria. Indeed, non-practicing entities have successfully managed to get injunctive relief post-*eBay* where they have shown potential injury to its licensing program.[4]

## IV.     CONCLUSION

For the foregoing reasons, Dynatrace's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. The Court **DENIES** Dynatrace's motion to dismiss with regards to (i) SRI's direct infringement claims, (ii) SRI's inducement infringement claims to the extent based on post-filing conduct, (iii) SRI's contributory infringement claims to the extent based on post-filing conduct,

---

[4] *See e.g. Commonwealth Scientific and Indus. Research Organisation v. Buffalo Technology Inc.*, No. 6:06-cv-324, 2007 U.S. Dist. Lexis 43832 (E.D. Tex. June 15, 2007) (Although plaintiff does not practice the invention, an injunction was warranted because plaintiff is a research institution and relies heavily on the ability to license its IP to finance plaintiff's R&D.); *see also Acticon Tech. v. Heisei Elecs. Co.*, No. 06-cv-4316 (KMK), 2008 WL 356872 (S.D. N.Y. Feb. 5, 2008) (The injunction was entered following a default judgment against defendant. Because no discovery was taken in this case, there are few facts contained in the magistrate judge's report and recommendation, which was adopted by the district court. Based on a review of plaintiff Acticon Technologies' website, it appears that Acticon is involved solely in licensing its intellectual property and does not practice its patents.).

and (iii) SRI's prayer for injunctive relief.  It **GRANTS** Dynatrace's motion to dismiss with regards to (i) SRI's inducement infringement claims to the extent based on pre-filing conduct, (ii) SRI's contributory infringement claims to the extent based on pre-filing conduct, and (iii) SRI's willful infringement claims.

   This order disposes of Docket No. 39.


   **IT IS SO ORDERED**.


Dated: July 3, 2018

                             _____
                             EDWARD M. CHEN
                             United States District Judge